1

2

3

4

UNITED STATES DISTRICT COURT

5
EASTERN DISTRICT OF CALIFORNIA

6

7   RON GIVENS, an individual;            No.  2:20-cv-00852-JAM-CKD
    CHRISTINE BISH, an
8   individual,

9              Plaintiffs,              **ORDER DENYING PLAINTIFFS'**
                                        **APPLICATION FOR A TEMPORARY**
10        v.                            **RESTRAINING ORDER**

11  GAVIN NEWSOM, in his official
    capacity as Governor State of
12  California; XAVIER BECERRA,
    in his official capacity as
13  the Attorney General of
    California; WARREN STANLEY,
14  in his official capacity as
    Commissioner of California
15  Highway Patrol; SONIA ANGELL,
    in her official capacity as
16  California Public Health
    Officer,
17
               Defendants.
18

19

20        Ron Givens and Christine Bish filed an eight-count complaint

21  against Defendants Governor Gavin Newsom, Attorney General Xavier

22  Becerra, California Highway Patrol Commissioner Warren Stanley,

23  and California Public Health Officer Sonia Angell.  Compl., ECF

24  No. 1.  Plaintiffs allege the stay at home order enacted by

25  Governor Newsom to slow the spread of Coronavirus Disease 2019

26  ("COVID-19") impermissibly infringes upon their constitutional

27  rights to speak, assemble, and petition the government.  They

28  further allege that the order infringes upon their due process

1

1  rights and their right to liberty under the California

2  Constitution.

3      Plaintiffs then filed an application for a temporary

4  restraining order.  Application for TRO ("TRO"), ECF No. 5.  They

5  request the Court enjoin enforcement of the State order so they

6  may hold political demonstrations, rallies, protests, and

7  religious services[1] in compliance with the Centers for Disease

8  Control's ("CDC") social distancing guidelines.  TRO at 2.

9  Plaintiffs also request the Court order Defendants to issue them

10 permits so they may proceed with their planned protests and

11 rallies at the State Capitol.  Id.

12     The Court held a hearing on the TRO application on May 7,

13 2020.  After considering the papers filed in support of and in

14 opposition to the request, and argument presented at the hearing,

15 for the reasons set forth below, the Court DENIES Plaintiffs'

16 Application for a Temporary Restraining Order.

17

18              I.   BACKGROUND

19     On December 31, 2019, the World Health Organization ("WHO")

20 China Country Office learned of cases of a pneumonia of unknown

21 cause.  WHO, COVID-19 Situation Report (January 21, 2020).

22 COVID-19 was later identified as the cause.  Id.  Those initial

23 infections were but squalls preceding a hurricane.  To date,

24 COVID-19 has infected over three and a half million and killed

25 ──────────────

26 [1] The complaint does not allege Plaintiffs are injured by being
   barred from religious services in violation of the First
27 Amendment's Free Exercise Clause.  As a result, Plaintiffs have
   not sufficiently alleged standing to challenge the State order to
28 the extent it bars in-person religious services.

                          2

over 250,000 people worldwide.  WHO, COVID-19 Situation Report (May 7, 2020).  Responding to this ever-evolving public health crisis, Governor Newsom issued a statewide "stay at home order." See Ex. A to Compl., ECF No. 1-1.  The order went into effect on March 19, 2020.  Id.  It directs California residents "to stay home or at their place of residence except as needed to maintain continuity of operations of federal critical infrastructure services."  Id. ¶ 1.  The order's stated purpose is "to protect the public health of Californians" by "mitigat[ing] the impact of COVID-19."  Ex. A to Compl. ¶ 1.

To that end, the order directs residents to "heed the current State public health directives."  Id.  State public health officials have determined that "all gatherings" of any size and in any "indoor or outdoor space" "should be postponed or canceled."  Cal. Dep't of Pub. Health, Guidance for the Prevention of COVID-19 Transmission for Gatherings, March 16, 2020.  This determination "applies to all non-essential professional, social, and community gatherings regardless of their sponsor."  Id.  The order is in effect "until further notice."  Ex. A to Compl. ¶ 1.

Givens works for the Sacramento County Gun Club.  Compl. ¶ 8.  As COVID-19 infections increased, the Gun Club experienced a surge in firearm sales.  Id. ¶ 27.  Busy enforcing the state's COVID-19 protective measures, the California Department of Justice began to experience a backlog in processing the background checks required for firearm purchasers.  Id. ¶¶ 25-29. Givens seeks to protest these delays at the California State Capitol.  Id. ¶ 24.  He submitted a permit application to the

1   California Highway Patrol's ("CHP") permit office on April 22,

2   2020.  Id. ¶ 31.  The CHP denied his permit application.  Compl.

3   ¶ 34.

4        Bish, on the other hand, is campaigning to be California's

5   U.S. Representative for its Sixth Congressional District.  Id.

6   ¶ 41.  On April 23, 2020, Bish applied to the CHP for a permit to

7   hold a political rally at the California State Capitol.  Id.

8   ¶ 43.  The CHP also denied Bish's permit application.  Id. ¶ 45.

9        The CHP denied Plaintiffs' permits pursuant to the State's

10  ban on mass gatherings.  Ex. A to Opp'n ¶ 10.  Under this

11  directive, the CHP may not issue any permits that would authorize

12  gatherings barred by the State's stay at home order.  Id.

13  Plaintiffs challenge the State order, facially and as applied,

14  alleging it violates their freedom of speech, freedom to

15  assemble, and freedom to petition the government under the United

16  States and California constitutions.  They also argue the order

17  violates their right to liberty under the state constitution.

18

19                         II.  OPINION

20       A.   Judicial Notice

21       District courts may take judicial notice of "a fact that is

22  not subject to reasonable dispute because it: (1) is generally

23  known within the trial court's territorial jurisdiction; or (2)

24  can be accurately and readily determined from sources whose

25  accuracy cannot reasonably be questioned."  Fed. R. Evid.

26  201(b).  To this end, a court may take judicial notice "of court

27  filings and other matters of public record," Reyn's Pasta

28  Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n.6 (9th Cir.

                                4

2006), including "government documents available from reliable sources on the internet," <u>California River Watch v. City of Vacaville</u>, No. 2:17-cv-00524-KJM-KJN, 2017 WL 3840265, at *2 n.1 (E.D. Cal. Sept. 1, 2017).

Plaintiffs request the Court take judicial notice of: (1) Executive Order 2020-18, from the Executive Department of the State of Arizona, signed by Governor Douglas Ducey on March 13, 2020; and (2) Stay at Home Order, from the Department of Public Health for the State of Ohio, signed by Director Amy Acton on March 22, 2020. Plaintiffs' Request for Judicial Notice, ECF No. 16. The government documents Plaintiffs reference are both proper subjects of judicial notice. The Court therefore GRANTS Plaintiffs' requests. In doing so, the Court judicially notices "the contents of the documents, not the truth of those contents." <u>Gish v. Newsom</u>, No. EDCV 20-755-JGB(KKx), at *2 (C.D. Cal. April 23, 2020).

B.   <u>Legal Standard</u>

Temporary restraining orders are emergency measures, intended to preserve the status quo pending a fuller hearing on the injunctive relief requested, and the irreparable harm must therefore be clearly immediate. Fed. R. Civ. Proc. 65(b)(1); <u>see</u> <u>Reno Air Racing Ass'n, Inc. v. McCord</u>, 452 F.3d 1126, 1131 (9th Cir. 2006). The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction. <u>Lockheed Missile & Space Co. v. Hughes Aircraft Co.</u>, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995); <u>see</u> <u>Stuhlbarg Intern.</u> <u>Sales Co., Inc. v. John D. Brushy & Co., Inc.</u>, 240 F.3d 832, 839 n.7 (9th Cir. 2011).

1    Plaintiffs seeking these forms of injunctive relief must

2  demonstrate (1) that they are likely to succeed on the merits,

3  (2) that they are likely to suffer irreparable harm in the

4  absence of preliminary relief, (3) that the balance of equities

5  tips in their favor, and (4) that an injunction is in the public

6  interest.  Am. Trucking Ass'ns v. City of Los Angeles, 559 F.3d

7  1046, 1052 (9th Cir. 2009) (quoting Winter v. Natural Res. Def.

8  Council, 555 U.S. 7 (2008)).  In the Ninth Circuit, courts may

9  also issue temporary restraining orders when there are "serious

10 questions going to the merits" and a "balance of hardships that

11 tips sharply towards the plaintiff" so long as the remaining two

12 Winter factors are present.  Alliance for Wild Rockies v.

13 Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).

14    When applying either test, courts operate with the

15 understanding that a temporary restraining order, much like a

16 preliminary injunction, is an "extraordinary and drastic

17 remedy."  Cf. Munaf v. Geren, 553 U.S. 674, 690 (2008).  "The

18 propriety of a temporary restraining order, in particular,

19 hinges on a significant threat of irreparable injury [] that

20 must be imminent in nature."  Gish v. Newsom, No. EDCV 20-755-

21 JGB(KKx), 2020 WL 1979970, at *3 (April 23, 2020) (citing

22 Simula, Inc. v. Autoliv, Inc., 175 F.3d. 716, 725 (9th Cir.

23 1999); Caribbean Marine Serv. Co. v. Baldridge, 844 F.2d 668,

24 674 (9th Cir. 1988)).

25    C.   Analysis

26    Plaintiffs request the Court enjoin Defendants from

27 enforcing the State stay at home order against their permit

28 applications to hold protests and political rallies at the State

1    Capitol.  TRO at 1–2.  Plaintiffs contend they satisfy each of

2    the four conventional Winter factors for injunctive relief.  If

3    allowed to protest or hold a rally, Plaintiffs maintain they

4    would follow "the Center for Disease Control's social distancing

5    guidelines."  TRO at 18.

6         This Court finds, however, that Plaintiffs have failed to

7    demonstrate a likelihood of success on the merits of their

8    claims because the State order, and the CHP's denial of their

9    permit applications, are within the scope of the State's

10   emergency powers to fight the spread of COVID-19.  See Opp'n at

11   6–12.  Moreover, even under traditional constitutional analysis,

12   the State order does not violate Plaintiffs' rights.  Id. at 12–

13   20.  For the same reasons, Plaintiffs also fail to raise serious

14   questions going to the merits of these eight claims.  As a

15   result, the Ninth Circuit's "serious question" analysis does not

16   provide Plaintiffs an alternative avenue for preliminary relief.

17              1.    Likelihood of Success on the Merits / Serious

18                    Questions Going to the Merits

19              a.    Emergency Powers

20        "Upon the principle of self-defense, of paramount

21   necessity, a community has the right to protect itself against

22   an epidemic of disease which threatens the safety of its

23   members."  Jacobson v. Commonwealth of Massachusetts, 197 U.S.

24   11, 27 (1905).  The Supreme Court penned those words over a

25   hundred years ago, but they remain relevant today.  In Jacobson,

26   the Supreme Court upheld a state's exercise of its general

27   police powers to promote public safety during a public health

28   crisis.  Id. at 25.  A state's police power entails the

1   authority "to enact quarantine laws and 'health laws of every

2   description'"—even under normal circumstances.  Id.  Under

3   normal circumstances, however, state regulations enacted

4   pursuant to a general police power must, "always yield in case

5   of conflict" to both the Constitution and permissible exercises

6   of federal authority.  Id.

7       But in abnormal circumstances, "[t]he authority to

8   determine for all what ought to be done in [] an emergency must

9   [be] lodged somewhere or in some body."  Id. at 27.  It is not

10  "unusual nor [] unreasonable or arbitrary" to invest that

11  authority in the state.  Id.  Moreover, "the court would usurp

12  the function of another branch of government if it adjudged, as

13  a matter of law, that the mode adopted under the sanction of the

14  state, to protect the people at large was arbitrary, and not

15  justified by the necessities of the case."  Id. at 28.  In view

16  of this principle, when a state exercises emergency police

17  powers to enact an emergency public health measure, courts will

18  uphold it unless (1) there is no real or substantial relation to

19  public health, or (2) the measures are "beyond all question" a

20  "plain, palpable invasion of rights secured by [] fundamental

21  law."  Id. at 30.

22      This standard has endured.  Courts continue to apply it

23  when reviewing emergency public health measures enacted pursuant

24  to emergency police powers.  See, e.g., Gish, WL 1979970 at *5

25  (C.D. Cal. 2020) (citing Jacobson, 197 U.S. at 31); Robinson v.

26  Attorney General, No. 20-11401-B, WL 1952370, at *8 (11th Cir.

27  April 23, 2020) (same); In re Abbott, No. 20-50296, 2020 WL

28  1911216, at *16 (5th Cir. 2020) (same); Legacy Church, Inc. v.

8

1   Kunkel, No. CIV 20-0327 JB/SCY, 2020 WL 1905586, at *40 (D. N.M.

2   April 17, 2020) (same); Hickox v. Christie, 205 F.Supp.3d 579,

3   591-93 (D. N.J. 2016) (same).

4        In this case it is uncontroverted that the State's stay at

5   home order bears a real and substantial relation to public

6   health.  Here in California, as of May 6, 2020 COVID-19 has

7   infected 58,815 and killed 2,412.  See COVID-19 By the Numbers,

8   Cal. Dep't of Pub. Health (May 6, 2020).  The virus that causes

9   COVID-19 is known to quickly spread from person to person.  Watt

10  Decl. ¶¶ 9-10, ECF No. 13.  Unchecked, it can spread

11  exponentially and can endure over ten transmission cycles,

12  causing one person to be responsible for 1,024 other infections.

13  Id. ¶ 10.  Many who are infected show no symptoms but still

14  contribute to COVID-19's spread.  Id. ¶ 13.  The State's order,

15  and the Department of Public Health directives it incorporates,

16  seek to slow down the rate of transmission by drastically

17  reducing the number and size of all gatherings.  The "goal is

18  simple, [the State] want[s] to bend the curve, and disrupt the

19  spread of the virus."  Ex. A to Compl. ¶ 1.

20       Starting in December 2019, "California began working

21  closely with the national Centers for Disease Control and

22  Prevention, the United States Health and Human Services Agency,

23  and local health departments to monitor and plan for the

24  potential spread of COVID-19 to the United States."  Opp'n at 3

25  (citing Medley Decl., ECF No. 11).  The Court is in no position

26  to question expert determinations on the efficacy of reducing

27  gatherings in lowering the number of new infections.  See

28  Jacobson, 197 U.S. at 30 ("[I]t is no part of the function of a

1    court . . . to determine which of two modes was likely to be the

2    most effective for the protection of the public against

3    disease."); see also In re Abbott, 954 F.3d at 777.

4         Having to concede that the State's order relates to public

5    health, Plaintiffs contend only that the blanket ban on CHP

6    permits for protests or rallies at the State Capitol "is beyond

7    all question, a plain, palpable, invasion of fundamental rights

8    protected by the First and Fourteenth Amendments."  TRO at 7.

9    But their argument fails to convince this Court that the State's

10   total ban on public demonstrations is not a proper exercise of

11   the State's emergency powers.  This Court does not take lightly

12   its mandate to "guard with firmness every right appertaining to

13   life, liberty, or property as secured to the individual by the

14   supreme law of the land." Jacobson, 197 U.S. at 38.  But, in

15   the context of this public health crisis, the judiciary must

16   afford more deference to officials' informed efforts to protect

17   all their citizens, especially their most vulnerable, against

18   such a deadly pandemic.  See Jacobson, 197 U.S. at 28-32, 34-38;

19   Gish, 2020 WL 1979970, at *4-5.

20        The State's ban on public gatherings—namely ones where

21   upwards of 500 or 1,000 people may be in attendance—flows from a

22   larger goal of substantially reducing in-person interactions.

23   See Opp'n at 3-4.  Plaintiffs have not shown how this goal, and

24   the means used to achieve it, do not bear a "real and

25   substantial relationship" to preventing widespread transmission

26   of COVID-19.  See Jacobson, 197 U.S. at 30.  Moreover, as

27   further explained below, this Court finds that Plaintiffs have

28   not shown that the State's order is "beyond all question" a

1  "plain, palpable invasion of rights secured by [] fundamental

2  law."  Id. at 30.   Thus, the Court finds Plaintiffs are not

3  likely to succeed on their challenge to the State's stay at home

4  order as an impermissible exercise of emergency police powers.

5                    b.   Free Speech Clause

6      The First Amendment, as incorporated against the states

7  through the Fourteenth Amendment, states that "Congress shall

8  make no law . . . abridging the freedom of speech . . . or the

9  right of people peaceably to assemble."  U.S. CONST. Amend. I;

10  see also Lovell v. City of Griffin, 303 U.S. 444, 450 (1938)

11  (holding that the First Amendment's prohibitions also apply to

12  state and local government rule-makers).   "The protections

13  afforded by the First Amendment are nowhere stronger than in

14  streets and parks, both categorized for First Amendment purposes

15  as traditional public fora."  Berger v. City of Seattle, 569

16  F.3d 1029, 1035-36 (9th Cir. 2009).   The grounds of the State

17  Capitol building are chief among traditional public fora.  Home

18  to California's state government, the grounds are "especially

19  important locales for communication among the citizenry" and a

20  place for the citizenry to convey important messages to its

21  lawmakers.  Id. at 1036.

22      Even so, "certain restriction on speech in the public parks

23  are valid."  Id. (internal quotation marks and citations

24  omitted).  Specifically, when the restriction "is not subject-

25  matter censorship, but [a] content-neutral time, place, and

26  manner regulation of the use of a public forum," it may be

27  permitted.  Thomas v. Chicago Park Dist., 534 U.S. 316, 322

28  (2002); see also Berger, 569 F.3d at 1036.  And while "[t]he

11

1  California Constitution provides protections for speakers in

2  some respects broader than those provided by the First Amendment

3  of the Federal Constitution," with regard to "permissible

4  restrictions on expression in public fora," the state

5  constitution adopts the federal test.  Kuba v. 1-A Agric. Ass'n,

6  387 F.3d 850, 856 (9th Cir. 2004) (internal quotation marks and

7  citation omitted).  Accordingly, the Court looks to federal

8  standards to resolve both inquiries.  See id. at 857–58.

9      Plaintiffs argue the State's order acts as an impermissible

10  prior restraint on protected speech.  See Opp'n at 8–10.  And

11  while Defendants do not dispute that State's order restricts

12  speech before it occurs, they argue the temporary moratorium on

13  issuing permits is nonetheless a permissible time, place, and

14  manner restriction.  See Opp'n at 12–15.

15      The State's order, and the resulting moratorium on permits,

16  are, beyond question, content-neutral.  Pursuant to the State's

17  order, the CHP is temporarily denying all permits for any in-

18  person gatherings at the State Capitol.  See Ex. A to Opp'n

19  ¶ 10.  By definition, "blanket bans applicable to all speakers

20  are content-neutral."  Santa Monica Nativity Scenes Comm. v.

21  City of Santa Monica, 784 F.3d 1286, 1295 n.5 (9th Cir. 2015).

22  That the State's order permits a limited number of persons to

23  leave their homes so they may report the news and deliver

24  religious services via streaming or other technology is

25  inapposite.  See Reply at 4–5.  The CHP's temporary moratorium

26  on all permits for in-person gatherings applies to all

27  applicants.  Thus, the Court agrees with Defendants that the

28  constitutionality of this restriction on speech at the State

1   Capitol turns on whether it is a valid time, place, or manner

2   restriction.  See Thomas, 534 U.S. at 322 (finding a park's

3   content-neutral permit scheme regulating speech in a public

4   forum need not adhere to prior restraint procedural

5   requirements).

6        To be sure, a content-neutral regulation may nonetheless

7   run afoul of the Constitution.  A permissible time, place, or

8   manner restriction must also: (1) be narrowly tailored to serve

9   a significant governmental interest; and (2) leave open ample

10  alternative channels for communication of the information.

11  Berger, 569 F.3d at 1036 (citing Ward v. Rock Against Racism,

12  491 U.S. 781, 791 (1989)).  To be narrowly tailored, the

13  restriction must not "burden substantially more speech than is

14  necessary" to achieve a substantial government interest.  Ward,

15  491 U.S. at 799.  "[T]he existence of obvious, less burdensome

16  alternatives is a relevant consideration in determining whether

17  the fit between ends and means is reasonable."  Berger, 569 F.3d

18  at 1041 (internal quotation marks and citation omitted). But the

19  government "need not [use] the least restrictive or least

20  intrusive means" available to achieve its legitimate interests.

21  Ward, 491 U.S. at 798.

22       Admittedly, a blanket ban on the issuance of CHP permits

23  for an unspecified period does not intuitively ring of narrow

24  tailoring.  But "narrow" in the context of a public health

25  crisis is necessarily wider than usual.  The evidence before

26  this Court clearly demonstrates that in-person gatherings

27  increase the spread of COVID-19.  This is true even when people

28  attempt to comply with the CDC's recommendations.  See Watt

Decl. ¶ 17.  The State's stay at home order advances the only fool-proof way to prevent the virus from spreading at in-person gatherings: prohibiting in-person gatherings.  The State's objective "is not to exclude communication of a particular content, but to . . . prevent uses that are dangerous."  <u>Thomas</u>, 534 U.S. at 322.  At present, gatherings of large groups of people would be dangerous.

Plaintiffs assert they could hold protests and rallies "with no more risk than other activities" by following CDC guidelines, but a close examination of the evidence before this Court, including Plaintiffs' permit applications, belies this claim.  Exs. A–B to Lyons Decl., ECF No. 12.  Givens expects 1,000 people in attendance at his protest.  Ex. B to Lyons Decl.  Meanwhile, Plaintiff Bish expects 500 people in attendance and plans to play music, hire food trucks, distribute handouts, offer food and water, and set up balloons, chairs, tables, and tents.  Ex. A to Lyons Decl.  Further, it is unclear how Plaintiffs can confidently say they "have never contracted COVID-19" and could prevent anyone who has from attending their gatherings.  Givens Decl. ¶ 14, ECF No. 5-2; Bish Decl. ¶ 10, ECF No. 5-3; TRO at 15.  Contrary to Plaintiffs' contention, the record demonstrates that these gatherings put Plaintiffs and others at significantly <u>higher</u> risk than many other prohibited activities. Watt Decl. ¶¶ 15-18.

Defendants have conceded that Plaintiffs may plan in-car protests, "filling streets and honking horns as other groups have done during the COVID-19 pandemic."  Opp'n at 14.  Whether the State's order explicitly allows this means of protest does

1  not impact the Court's determination on the sufficiency of its

2  tailoring.  Plaintiffs challenge the stay at home order,

3  facially and as applied, to the extent that it prevents them

4  from hosting in-person gatherings at the State Capitol.  See TRO

5  at 1-2.  So, even if the State's order prohibits in-car

6  protests, that is not the basis upon which Plaintiffs allege the

7  order is unconstitutional as applied to them.  Nor does a ban on

8  in-car protests render the order facially invalid.  To succeed

9  on a facial challenge, a plaintiff must show there is "no set of

10 circumstances" under which the law could be constitutionally

11 applied.  United States v. Salerno, 481 U.S. 739, 745 (1987).

12 Plaintiffs have not met that burden.  Although a time, place,

13 and manner restriction must be narrowly tailored, it does not

14 require the "least restrictive means" possible."  Ward, 491 U.S.

15 at 798.

16      The California Department of Public Health has determined

17 that, to slow the rate of COVID-19 infections, gatherings—

18 especially of the scale Plaintiffs propose—should temporarily

19 cease.  See Cal. Dep't of Pub. Health, Guidance for the

20 Prevention of COVID-19 Transmission for Gatherings, March 16,

21 2020.  Plaintiffs have not proposed a more tailored option that

22 would ensure comparable levels of safety.  Absent an evidence-

23 based alternative, the Court lacks any basis to enjoin the

24 State's informed emergency response.  Accordingly, the Court

25 finds the State's prohibition on large gatherings and temporary

26 moratorium on CHP permits are narrowly tailored to serve, at

27 minimum, a significant governmental interest.  See Gish, WL

28 1979970 at *6 (holding that preventing the spread of COVID-19 is

1    in fact a compelling state interest).

2        Finally, a temporary moratorium on the issuance of CHP

3    permits does not foreclose all channels of communication.  As

4    Defendants argue, "Plaintiffs remain free to use online and

5    other electronic media to stage their rallies and make their

6    protests."  Opp'n at 13.  Indeed, given much of their intended

7    audience is presently at home, this may be a more effective way

8    of communicating their messages.  Further, as mentioned above,

9    Defendants concede that Plaintiffs may plan in-car protests

10   without fear of reprisal.  Opp'n at 14.

11       Considering the persistent threat of COVID-19, the Court

12   finds the State's stay at home order, and the resulting

13   moratorium on CHP permits, are content-neutral time, place, and

14   manner regulations designed to slow its spread.  Plaintiffs are

15   therefore unlikely to succeed on the merits of their free speech

16   claim.

17            c.   Freedom of Assembly Clause

18       The First Amendment guarantees that "Congress shall make no

19   law . . . abridging . . . the right of the people to peaceably

20   assemble."  U.S. CONST. Amend. I.  The right to assemble, "cannot

21   be denied without violating those fundamental principles which

22   lie at the base of all civil and political institutions."  De

23   Jonge v. Oregon, 299 U.S. 353, 364 (1937) (internal citation

24   omitted).  However, the right to assemble is still subject to

25   certain restrictions.  Again, in Jacobson, the Supreme Court

26   stated that constitutional rights "may at times, under the

27   pressure of great dangers" be restricted "as the safety of the

28   general public may demand."  197 U.S. at 29.  "[T]his settled

16

1 rule allows the state to restrict, for example, one's right to
2 assemble." <u>Legacy Church</u>, WL 1905586 at *25 (internal quotation
3 marks and citation omitted).

4     Today, the freedom of association has largely subsumed the
5 freedom of assembly. <u>See</u> <u>Roberts v. U.S. Jaycees</u>, 468 U.S. 609,
6 618. Parties bringing an expressive-association claim under the
7 First Amendment must demonstrate that they are asserting their
8 right to associate "for the purpose of engaging in those
9 activities protected by the First Amendment—speech, assembly,
10 petition for the redress of grievances, and the exercise of
11 religion." <u>Id.</u> The right to expressive association is not an
12 absolute right and can be infringed upon if that infringement
13 is: (1) unrelated to the suppression of expressive association;
14 (2) due to a compelling government interest; and (3) narrowly
15 tailored. <u>Id.</u> at 623.

16     For the reasons discussed above, the State's stay at home
17 order and the CHP's temporary moratorium on permits are wholly
18 unrelated to the suppression of expressive association. Both
19 flow from the State's interest in slowing the spread of COVID-
20 19. The State's order seeks to suppress the virus, not
21 expressive association. And, as is now well-established,
22 protecting California's residents from "[a] global pandemic and
23 its local outbreak amount to a compelling state interest."
24 <u>Legacy Church</u>, WL 1905586 at *40.

25     Finally, just as the State's order does not prohibit
26 substantially more speech than necessary to protect public
27 health, it also does not prohibit substantially more expressive
28 association than is necessary to advance this same objective.

17

1  Plaintiffs are unlikely to succeed on the merits of their

2  freedom of assembly claim.

3  　　　　　　　　　d.   Petition Clause

4  　　　The First Amendment protects "the right of the

5  people . . . to petition the Government for redress of

6  grievances."  U.S. Const. Amend. I; see also Borough of Duryea,

7  Pa. v. Guarnieri, 564 U.S. 379, 382 (2011).  The rights of

8  speech and petition share substantial common ground.  Id. at

9  388.  They are thought of as "cognate rights."  Thomas v.

10  Collins, 323 U.S. 516, 530 (1945).  Nonetheless, there are

11  subtle differences between the two.  "The right to petition

12  allows citizens to express their ideas, hopes, and concerns to

13  their government and their elected representatives, whereas the

14  right to speak fosters the public exchange of ideas that is

15  integral to deliberative democracy as well as to the whole realm

16  of ideas and human affairs."  Borough of Duryea, 564 U.S. at

17  388.  While both advance personal expression, "the right to

18  petition is generally concerned with expression directed to the

19  government seeking redress of a grievance."  Id.

20  　　　Defendants argue that Plaintiffs have not raised any

21  concerns in connection with their petition claim distinct from

22  those that are addressed by their freedom of speech and assembly

23  claims.  Opp'n at 16.  The Court agrees.  The right to petition

24  allows Plaintiffs to air a grievance to the government.  The

25  question then becomes: what grievances do Plaintiffs hope to

26  air?  At first blush, it seems Givens seeks to protest the

27  delays in firearm background checks.  See Compl. ¶ 2; Ex. B to

28  Lyons Decl.  And Bish seeks to promote herself as a candidate

18

1   while protesting the State's stay at home order.  See Compl.

2   ¶ 2; Ex. A to Lyons Decl.  But upon closer inspection,

3   Plaintiffs' overriding grievance is their inability to host in-

4   person gatherings under the State's order and the CHP's

5   temporary moratorium.

6       Plaintiffs' right to petition claim specifically states:

7   "The Orders and Defendants' enforcement thereof violate the

8   Petition Clause of the First Amendment . . . . "  Compl. ¶ 68.

9   Meanwhile, in their reply, Plaintiffs' only rebuttal is that,

10  "[j]ust as the Orders impermissibly limit free speech and the

11  right to peaceably assemble, they also impermissibly limit

12  Plaintiffs' right to petition."  Reply at 10.  Nowhere do

13  Plaintiffs suggest that the grievances they seek to air to the

14  government are anything but their present inability to gather in

15  person at the State Capitol.  And, while courts "should not

16  presume there is always an essential equivalence in the two

17  Clauses or that Speech Clause precedents necessarily and in

18  every case resolve Petition Clause claims[,]" "[i]nterpretation

19  of the Petition Clause must be guided by the objectives and

20  aspirations that underlie the right."  Borough of Duryea, 564

21  U.S. at 388 (emphasis added).

22      Plaintiffs' goal is to regain the ability to speak and

23  assemble on the grounds of the State Capitol.  As a result,

24  their Petition Clause claim is inextricably intertwined with

25  their Speech Clause and Assembly Clause claims.  The Court's

26  analysis for each of those claims therefore necessarily applies

27  here.  It follows that Plaintiffs' right to petition claim is

28  similarly unlikely to succeed on the merits.

1          e.   Due Process Clause

2          "It is a basic principle of due process that an enactment

3     is void for vagueness if its prohibitions are not clearly

4     defined." Grayned v. City of Rockford, 408 U.S. 104, 108

5     (1972).  Plaintiffs allege the State's order violates the Due

6     Process Clause of the Fourteenth Amendment to the United States

7     Constitution because it is "vague as to what precisely is being

8     ordered, and what actions may result in criminal penalties,

9     fines, imprisonment." Compl. ¶ 77.  However, "[c]ondemned to

10    the use of words, we can never expect mathematical certainty

11    from our language." Grayned, 408 U.S. at 110.  "To put a finer

12    point on it: perfect clarity and precise guidance have never

13    been required even of regulations that restrict expressive

14    activity." Edge v. City of Everett, 929 F.3d 657, 664 (9th Cir.

15    2019) (internal quotation marks and citations omitted).

16         Accordingly, the vagueness doctrine implicates two related

17    requirements.  "First, laws must give the person of ordinary

18    intelligence a reasonable opportunity to know what is

19    prohibited, so that he may act accordingly." Id. (internal

20    quotation marks and citation omitted).  Typically, all that is

21    required here is "fair notice of the conduct a statute

22    proscribes." Id. (internal quotation marks and citation

23    omitted).  But when First Amendment freedoms are in the balance,

24    "an even greater degree of specificity and clarity of laws is

25    required." Kev, Inc. v. Kitspa Cty., 793 F.2d 1053, 1057 (9th

26    Cir. 1986) (internal citation omitted).  Courts must instead ask

27    "whether language is sufficiently murky that speakers will be

28    compelled to steer too far clear of any forbidden areas." Edge,

1   929 F.3d at 664 (internal quotation marks and citation omitted).

2   The second requirement "aims to avoid arbitrary and

3   discriminatory enforcement and demands that laws provide

4   explicit standards for those who apply them."  Id. at 665

5   (internal quotation marks and citation omitted).

6       Plaintiffs' argument focuses on the use of the word "heed"

7   in the State's order.  See TRO at 13.  Plaintiffs argue that,

8   because the State's order instructs the public merely to "heed"

9   to public health directives, "it does not appear to order

10  compliance therewith."  Id.  While the request to "heed the

11  current State public health directives" might be understood as a

12  recommendation, the remainder of the State's order, and the

13  incorporated health directives, are unambiguous.  Just before,

14  and as part of, the request to heed to public health directives,

15  Governor Newsom, bolded and uppercase, states, "IT IS HEREBY

16  ORDERED . . . ."  See Ex. A to Compl. ¶ 1 (emphasis added).  The

17  request to heed follows immediately thereafter.  Id.  Unlike

18  "heed," "ordered" is unquestionably mandatory.

19      Next, the State's order incorporates the "Order of the

20  State Public Health Officer."  Id.  Within that order, the State

21  Public Health Officer and Director of the California Department

22  of public health "order[s] all individuals living in the State

23  of California to stay home or at their place of residence except

24  as needed to maintain continuity of operations of the federal

25  critical infrastructures."  Id.  Thus, looking exclusively at

26  the language of the State's order, the Court is not persuaded

27  that Plaintiffs might realistically interpret it as permitting

28  groups of 500 to 1,000 to meet, in person, for any purpose other

21

1   than those defined as "needed to maintain continuity of

2   operations of federal critical infrastructure."

3       Even considering the greater degree of clarity required

4   when First Amendment freedoms are involved, the language is not

5   so vague as to compel Plaintiffs' "to steer too far clear of any

6   forbidden areas." Edge, 929 F.3d at 664.  This claim is

7   therefore unlikely to succeed on the merits.

8                  f.  Right to Liberty

9       Finally, Plaintiffs contend that the State's stay at home

10  order violates their right to liberty under Article I, Section 1

11  of the California Constitution.  In so arguing, Plaintiffs cite

12  to the principle that, in California, public health officials

13  seeking to place an individual in quarantine must have

14  "'reasonable ground[s] [] to support the belief' that the person

15  so held is infected." Ex Parte Martin, 83 Cal. App. 2d 164, 167

16  (1948) (citing Ex Parte Arata, 52 Cal. App. 380, 385 (1921)).

17  Plaintiffs cite Jew Ho v. Williamson, 103 F.10 (C.C.D. Cal.

18  1900), wherein the court found that sealing off an entire

19  section of San Francisco to prevent the spread of the bubonic

20  plague was "unreasonable, unjust, and oppressive."  Id. at 26.

21      Both cases relied upon by Plaintiffs are easily

22  distinguishable and of little precedential value to this Court.

23  Ex Parte Martin involved the quarantine of two individuals in

24  jail after passing through a place of prostitution, and Jew Ho

25  involved a racially-motivated and scientifically-unfounded

26  quarantine of San Francisco's Chinatown.  See Ex Parte Martin,

27  83 Cal. App. 2d at 166; Jew Ho, 103 F.10 at 23, 26.  These cases

28  are clearly inapposite.

                              22

1    The Court agrees with Defendants that, requiring public
2 health officials in the current pandemic to "identify specific
3 individuals who carry the virus and order only them to stay home
4 would not be feasible." Opp'n at 17.  That would require far
5 more aggressive testing and contact-tracing, neither of which
6 the State, at present, has the capacity to do.  Moreover, the
7 current public health crisis differs *toto coelo* from San
8 Francisco's discriminatory quarantine of Chinatown.  Because
9 Plaintiffs fails to support this claim in any meaningful way, it
10 is unlikely to succeed on the merits.

11                    2.   Remaining Factors

12    A district court may not grant a plaintiff's motion for a
13 temporary restraining order if the request fails to show the
14 plaintiff is likely to succeed on the merits of a claim or, at
15 least, raises serious questions going to the merits of that
16 claim.  See Winter, 555 U.S. at 20; Alliance for Wild Rockies,
17 632 F.3d at 1135.  Plaintiffs here did not make either showing.
18 The Court need not consider the remaining factors in denying
19 their request.  Gish, WL 1979970, at *7.

20    The Court is well aware that the State's stay at home order
21 being challenged by these Plaintiffs is burdensome, and even
22 devastating, to many.  This pandemic has undoubtedly taken its
23 toll.  But the sacrifices all California residents are being
24 asked to make to protect the state's most vulnerable flow from a
25 constitutional executive order.  And our willingness to rise to
26 the challenge posed by that order is a true measure of our
27 humanity.
28 ///

1          III. ORDER

2      For the reasons set forth above, the Court DENIES

3  Plaintiffs' Application for a Temporary Restraining Order.

4      IT IS SO ORDERED.

5  Dated: May 8,2020

6

7                                    JOHN A. MENDEZ,
                                     UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                              24