1  ROB BONTA
   Attorney General of California
2  PAMELA J. HOLMES
   MARK R. BECKINGTON
3  Supervising Deputy Attorneys General
   ANNA FERRARI, State Bar No 261579
4  JAMES W. WALTER, State Bar No 173481
   Deputy Attorneys General
5   I Street, Suite 125
   Sacramento, CA 94244
6   Telephone: (916) 210-7542
   Fax: (916) 322-8288
7   E-mail: James.Walter@doj.ca.gov
   *Attorneys for Defendants California Governor*
8  *Gavin Newsom, California Attorney General Rob*
   *Bonta, California Highway Patrol Commissioner*
9  *Amanda Ray, and California State Public Health*
   *Officer Tomás Aragón*
10

11              IN THE UNITED STATES DISTRICT COURT

12             FOR THE EASTERN DISTRICT OF CALIFORNIA

13

| | |
|---|---|
| 14  **RON GIVENS, an individual; CHRISTINE BISH, an individual,** | 2:20-cv-00852-JAM-CKD |
| 16                              Plaintiffs, | **DEFENDANTS' NOTICE OF CROSS-MOTION AND CROSS-MOTION FOR** |
| 17         v. | **SUMMARY JUDGMENT; DEFENDANTS' MEMORANDUM OF** |
| 18  **GAVIN NEWSOM, in his capacity as Governor of California; ROB BONTA, in** | **POINTS AND AUTHORITIES IN SUPPORT OF CROSS-MOTION FOR** |
| 19  **his capacity as Attorney General of California; AMANDA RAY, in her capacity** | **SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS'** |
| 20  **as Commissioner of the California Highway Patrol; and TOMÁS ARAGÓN, in his** | **MOTION FOR SUMMARY JUDGMENT** |
| 21  **capacity as the State Public Health Officer,[1]** | **[Fed. R. Civ. P. 56]** |
| 22                              Defendants. | Date:        August 9, 2022 |
| 23  | Time:        1:30 p.m. Dept:        6 |
| 24  | Judge:       Hon. John A. Mendez Action Filed:  April 27, 2020 |

25

---

26      [1] Amanda Ray, California Highway Patrol Commissioner, succeeded former
   Commissioner Warren Stanley; Tomás Aragón, California State Public Health Officer, succeeded
27  Erica Pan, former Acting California Public Health Officer; and Rob Bonta, California Attorney
   General, succeeded former Attorney General Xavier Becerra.  Fed. R. Civ. P. 25(d) (an "officer's
28  successor is automatically substituted as a party").

**TO THE COURT AND PLAINTIFFS RON GIVENS, et al.:**

**PLEASE TAKE NOTICE** that on August 9, 2022, at 1:30 p.m., or as soon thereafter as the matter may be heard, at the United States District Court, Central District of California, Robert T. Matsui United States Courthouse, 501 I Street, Sacramento, California 95814, Courtroom 6, 14th floor, Defendants Governor Gavin Newsom, Attorney General Rob Bonta, California Highway Patrol Commissioner Amanda Ray, and Public Health Officer Tomás Aragón will and hereby do cross-move for summary judgment under Federal Rule of Civil Procedure 56 on the grounds that this action has no merit, there is no triable issue as to any material fact and Defendants are entitled to judgment as a matter of law.

Specifically, there is no triable issue as to Plaintiffs' claims for relief under the Free Speech Clause, the Freedom of Assembly Clause, and Right to Petition Clause of the First Amendment because Defendants' orders at issue in this litigation satisfy the applicable level of scrutiny given the compelling need to manage the COVID-19 crisis during the time Plaintiffs sought to use the grounds of the State Capitol. Moreover, there is no triable issue as to Plaintiffs' fourth claim for relief under the Due Process Clause seeking to void the Governor's executive order on vagueness grounds because the use of the word "heed" in the order is sufficiently definite, and even if it were vague, lacks any nexus to the claim of harm asserted by Plaintiffs. Additionally, the entire action should be dismissed as moot based on new developments that have emerged since the Court denied Defendants' motion to dismiss on that ground.

This Cross-Motion for Summary Judgment is filed in conjunction with Defendants' opposition to Plaintiffs' Motion for Summary Judgment pursuant to the Joint Stipulation and Order Modifying Summary Judgment Briefing Schedule entered May 9, 2022. ECF 94. This Cross-Motion is made following a conference of counsel pursuant to the Court's standing order, which took place telephonically on April 6, 2022.

This Motion is based on this Notice of Cross-Motion and Cross-Motion for Summary Judgment; the accompanying Memorandum of Points and Authorities; the Statement of Undisputed Facts, all pleadings and papers on file in this action; and such other matters as the Court may deem appropriate.

.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 2

    I.    The COVID-19 Pandemic and California's Swift and Measured Response .......... 2

        A.    The COVID-19 Outbreak.......................................................................... 2

        B.    The State's Response to the COVID-19 Outbreak ..................................... 4

    II.    Timeline of Changes to the Capitol Grounds Permitting Process Based on COVID-19 Safety Measures. ......................................................................................... 6

    III.    The Present Lawsuit.................................................................................................. 9

        A.    The Complaint........................................................................................... 9

        B.    Procedural History ................................................................................... 9

LEGAL STANDARD ..................................................................................................... 11

ARGUMENT .................................................................................................................. 11

    I.    Plaintiffs' First Amendment Claims Fail Because the Brief Moratorium Was Necessary to Protect the Public and Narrowly Tailored to Evolving Circumstances. ......................................................................................................... 11

        A.    CHP's Temporary Denial of Permits Applications Was a Permissible Content-Neutral Time, Place, and Manner Restriction That Did Not Violate Plaintiffs' Right to Freedom of Speech or Assembly............................................................................................................ 12

            1.    CHP's temporary restrictions  were content-neutral..................... 12

            2.    CHP's temporary restrictions were narrowly tailored ................. 13

            3.    CHP's restrictions on permits left open ample alternative channels of expression ................................................................. 16

        B.    The Stay-at-Home Order Is Also Content-Neutral and Narrowly Tailored to Advance a Significant Governmental Interest........................ 17

        C.    Although Strict Scrutiny Does Not Apply, the Stay-at-Home Order Would Survive Heightened Review Because It Is Narrowly Tailored ................................................................................................... 20

        D.    The Stay-at-Home Order Overcomes Any Presumption of Invalidity ..... 23

    II.    The Stay-at-Home Order Did Not Violate Plaintiffs' Right to Petition................ 25

    III.    Plaintiffs' Due Process Claim Fails Because the Executive Order Was Not Unconstitutionally Vague. ...................................................................................... 26

    IV.    Plaintiffs' Claims Should Be Dismissed As Moot............................................... 28

CONCLUSION ............................................................................................................... 31

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Already, LLC v. Nike, Inc.*
  568 U.S. 85 (2013) ............................................................................................... 29

*Am. Diabetes Ass'n v. U.S. Dept. of Army*
  938 F.3d 1147 (9th Cir. 2019) ............................................................................. 30

*Anderson v. Liberty Lobby, Inc.*
  477 U.S. 242 ......................................................................................................... 11

*Animal Legal Defense Fund v. Wasden*
  878 F.3d 1184 (9th Cir. 2018) ............................................................................. 18

*Arizona Free Enter. Club's Freedom Club PAC v. Bennett*
  564 U.S. 721 (2011) ............................................................................................. 20

*Berger v. City of Seattle*
  569 F.3d 1029 (9th Cir. 2009) ............................................................................. 25

*Bl(a)ck Tea Society v. City Of Boston*
  378 F.3d 8 (1st Cir. 2004) .................................................................................... 24

*Borough of Duryea, Pa. v. Guarnieri*
  564 U.S. 379 (2011) ......................................................................................... 25, 26

*Boston Bit Labs, Inc. v. Baker*
  11 F.4th 3 (1st Cir. 2021) ..................................................................................... 30

*Calvary Chapel San Jose v. Cody*
  2022 WL 827116 (N.D. Cal. Mar. 18, 2022) ...................................................... 31

*County of Butler v. Governor of Pennsylvania*
  8 F.4th 226 (3d Cir. 2021) ................................................................................... 30

*Edge v. City of Everett*
  929 F.3d 657 (9th Cir. 2019) ............................................................................... 27

*Edwards v. Coeur d'Alene*
  262 F.3d 856 (2001) ............................................................................................. 17

*Givens v. Newsom*
  459 F.Supp.3d 1302 (E.D. Cal. 2020) ................................................................. 10

ii

# TABLE OF AUTHORITIES
**(continued)**

Page

*Homeaway.com, Inc. v. City of Santa Monica*
918 F.3d 676 (9th Cir. 2019)........................................................................................ 18

*In re Nat'l Sec. Letter*
863 F.3d 1110 (9th Cir. 2017)...................................................................................... 19

*Italian Colors Rest. v. Becerra*
878 F.3d. 1165 (9th Cir. 2018)..................................................................................... 18

*Jacobs v. Clark Cty. Sch. Dist.*
526 F.3d 419 (9th Cir. 2008)........................................................................................ 12

*Lighthouse Fellowship Church v. Northam*
___ F.4th ____ (4th Cir. Dec. 14, 2021) .................................................................. 30

*Lone Star Security and Video v. City of Los Angeles*
827 F.3d 1192 (9th Cir. 2016)...................................................................................... 18

*Long Beach Area Peace Network v. City of Long Beach*
574 F.3d 1011 (9th Cir. 2009)................................................................................ 23, 24

*Marshall v. United States*
414 U.S. 417 (1974) ...................................................................................................... 15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
475 U.S. 574 (1986) ...................................................................................................... 11

*Members of City Council of City of Los Angeles v. Taxpayers for Vincent*
466 U.S. 789 (1984) ...................................................................................................... 19

*Menotti v. City of Seattle*
409 F.3d 1113 (2005)..................................................................................................... 16

*Monell v. Dep't Soc. Servs.*
436 U.S. 658 (1978)....................................................................................................... 28

*Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*
508 U.S. 656 (1993) ...................................................................................................... 29

*Pacific Coast Horseshoeing School, Inc. v. Kirchmeyer*
961 F.3d 1062 (9th Cir. 2020)................................................................................. 18, 19

*Pine Valley House Resort, LLC v. Newsom*
2022 WL 747729 (S.D. Cal. Mar. 10, 2022) ............................................................ 31

iii

**TABLE OF AUTHORITIES**
(continued)

Page

*Reed v Town of Gilbert, Ariz.*
    135 S.Ct. 2218 (2015) ............................................................................................ 19

*Resurrection School v. Hertel*
    No. 20-2256, __ F.4th __ (6th Cir. May 25, 2022) ........................................ 2, 29, 30

*Roman Cath. Diocese of Brooklyn v. Cuomo*
    __U.S. __, 141 S. Ct. 63 (2020) ........................................................... 15, 16, 21

*S. Bay United Pentecostal Church v. Newsom*
    985 F.3d 1128 (9th Cir. 2020) .......................................................................... 20, 22, 30

*Santa Monica Food Not Bombs v. City of Santa Monica*
    450 F.3d 1022 (9th Cir. 2006) ..................................................................................... 15

*Slidewaters LLC v. Wash. State Dep't of Lab. & Indus.*
    4 F.4th 747 (9th Cir. 2021) .......................................................................................... 3

*Thomas v. Chicago Park Dist.*
    534 U.S. 316 (2002) ........................................................................................... 15, 24

*Thomas v. Collins*
    323 U.S. 516 (1945) ..................................................................................................... 25

*Turner Broad. Sys., Inc. v. Fed. Comm. Com.*
    520 U.S. 180 (1997) ..................................................................................................... 15

*United States v. Salerno*
    481 U.S. 739 (1987) ..................................................................................................... 18

*Ward v. Rock Against Racism*
    491 U.S. 781 (1989) ........................................................... 12, 13, 15, 17, 19, 24

*Workman v. Mingo Cty. Bd. of Ed.*
    419 Fed. Appx. 348 (4th Cir. 2011) ......................................................................... 21

**STATUTES**

42 U.S.C. § 1983 .............................................................................................................. 28

Cal. Health & Safety Code § 120140 .......................................................................... 27

**CONSTITUTIONAL PROVISIONS**

U.S. Const., Amendment I .................................................................................... 1, 9, 10, 25

Defs.' Notice of Cross-Mot. and Cross-Mot. for Summ. J.; Mem. P. & A.

# TABLE OF AUTHORITIES
### (continued)

**Page**

U.S. Const., Amendment XI ................................................................................................. 9

U.S. Const., Amendment XIV ........................................................................................ 2, 9

California Constitution ......................................................................................................... 9

**COURT RULES**

Fed. R. Civ. P. 56 .............................................................................................................. 11

**OTHER AUTHORITIES**

CalMatters, "'Hella connected': How California lawmakers are governing from home," Apr. 8, 2020, available at https://calmatters.org/health/coronavirus/2020/04/coronavirus-california-legislature-working-from-home-remote-government/ (as of May. 30, 2022) ........................ 17

California Department of Public Health, CDPH Guidance for the Prevention of COVID-19 Transmission for Gatherings (March 16, 2020), available at https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/CDPHGuidanceforthePreventionofCOVID19TransmissionforGatherings.aspx ................................................................................................................................... 22

Center for Disease Control and Prevention, COVID-19 Mortality Overview, https://www.cdc.gov/nchs/covid19/mortality-overview.htm (last accessed May 26, 2022) .......................................................................................................................... 3

Executive Order N-07-21 ..................................................................................................... 6

Executive Order N-33-20 ..................................................................................................... 4

Executive Order N-60-20 ..................................................................................................... 4

Webster's Dictionary ......................................................................................................... 28

v

Defs.' Notice of Cross-Mot. and Cross-Mot. for Summ. J.; Mem. P. & A.

1

## INTRODUCTION

2    When an unknown, novel virus began ravaging California, the Governor and the State

3  Public Health Officer took action to mitigate its spread by issuing a temporary order directing

4  people to respond to "the current statewide status of COVID-19" by staying at home.  This order

5  was issued in March 2020, long before any vaccine had been authorized or medical consensus

6  regarding how to control the spread of COVID-19 had been reached.  In accordance with these

7  directives, the California Highway Patrol (CHP) began to deny permits on a temporary basis for

8  events at the State Capitol from April 21 to May 24, 2020, including two applications submitted

9  by Plaintiffs.

10    We cannot forget how devastating the virus was in 2020, before vaccines and therapeutics

11  were widely available.  No doubt, the public safety measures taken by the State saved lives.  The

12  actions were necessary at the time to achieve the State's interests in protecting its residents, and

13  were narrowly tailored to achieve those interests.  These actions have evolved over the course of

14  the pandemic, adjusting to the unique threats posed by the differing variants of COVID-19 and

15  based on the most current scientific understanding of the virus, how it transmits, and its risks to

16  life and health.

17    In that context, Plaintiffs' first, second, and third claims that CHP's temporary suspension

18  of permitted events impermissibly infringed on their First Amendment rights of speech, assembly

19  and petition lack any merit.  The permit moratorium was a content-neutral time, place and manner

20  restriction:  It suspended all permits during the brief time that it was in effect, irrespective of

21  subject matter or purpose.  And because it treated all permit applications uniformly without

22  passing upon their content, it did not operate as a prior restraint on speech.

23    Under traditional intermediate scrutiny analysis for a content-neutral regulation, the State

24  not only had an important interest—protecting the public from a deadly pandemic—but also did

25  not burden speech more than was necessary to protect that interest, leaving Plaintiffs and others

26  with ample alternative avenues for speech, assembly and petition that did not threaten the public

27  health.  Even under strict scrutiny—the applicable standard in Plaintiffs' view—the State's

28  regulations were drawn narrowly to serve this compelling interest.  As such, the State's

1

1    regulations overcome any presumption of invalidity that might apply to political speech in a

2    public forum.

3        Nor is there any merit to Plaintiffs' fourth claim that the State's public health orders are

4    void for vagueness in violation of the Fourteenth Amendment Due Process Clause, which

5    Plaintiffs' motion for summary judgment does not even raise.

6        Finally, Defendants ask the Court to reconsider its prior ruling declining to dismiss this

7    action on grounds of mootness. Additional facts and authorities that have emerged since the

8    Court last considered mootness support the conclusion that no exception to mootness now

9    applies. *See Resurrection School v. Hertel*, No. 20-2256, ___ F.4th ___, 2022 WL 1656719 (6th

10   Cir. May 25, 2022) (en banc).

11       Because each of Plaintiffs' claims fail in its entirety, the Court should deny Plaintiffs'

12   motion for summary judgment, grant Defendants' cross-motion for summary judgment, and enter

13   judgment in Defendants' favor.[2]

14                              **BACKGROUND**

15   **I.   THE COVID-19 PANDEMIC AND CALIFORNIA'S SWIFT AND MEASURED RESPONSE**

16       **A.   The COVID-19 Outbreak**

17       Since March 2020, California—like the rest of the world—has faced a public health crisis

18   of a magnitude not seen in more than a century. Based on COVID-19's mortality level—over one

19   million deaths[3] in the United States from COVID alone and still climbing,—the U.S.'s 2020 and

20   2021 death toll from COVID-19 is higher than the number of Americans that died in the 1918-

21   1919 influenza pandemic or who were killed in World War II. Walter Decl., Ex. A [Rutherford

22   Report] at ¶ 33.[4] According to CDC data and forecasting, COVID-19 was the third-highest cause

23

24   ───────────────

         [2] In accordance with the Court's Standing Order, and the Order Modifying Summary
     Judgment Briefing Schedule entered May 9, 2022, ECF 94, this brief is filed in support of
25   Defendants' Cross-Motion for Summary Judgment and in opposition to Plaintiffs' Motion for
     Summary Judgment, ECF 92.
26       [3] This figure excludes deaths resulting from hospital systems being so overwhelmed that
     they could not properly treat patients hospitalized for other treatable conditions.
27       [4] The expert report of Dr. George Rutherford, along with the exhibits attached to that
     report, are submitted as Exhibit A to the Declaration of James W. Walter, filed concurrently with
28   this memorandum. Throughout this memorandum, it is cited as the "Rutherford Report."

                                          2

of death in the United States in 2020, after cancer and heart disease. *Id.* An epidemic that has killed at least 1,004,447 Americans and 95,562 Californians as of May 31, 2022 is severe and justified extraordinary measures.[5]

"COVID-19 is a novel, potentially deadly, severe acute respiratory illness caused by a virus that is most commonly transmitted person to person." *Slidewaters LLC v. Wash. State Dep't of Lab. & Indus.*, 4 F.4th 747, 752 (9th Cir. 2021). "Transmission," which is spread primarily through respiratory droplets produced when individuals speak or breathe, "can occur even when the infected person does not have symptoms and does not know of the infection." *Id.*; *see also* Walter Decl., Ex. A [Rutherford Report] at ¶¶ 36-40. Until vaccines authorized for emergency use in December 2020 became widely available, those infected with COVID-19 had a high risk of serious illness. Widespread transmission risked overwhelming California's healthcare system and causing massive death tolls. Walter Decl., Ex. A [Rutherford Report] at ¶¶ 34, 55. Before those vaccines became widely available, the primary means of prevention of the spread of COVID-19 involved restricting group activities, especially where wearing face coverings and maintaining physical distance were less feasible. *Id.*, ¶¶ 4, 66, 67, 71, 72, 73.

The risk of COVID-19 transmission at group gatherings increases with the number of people present, the proximity between individuals from different households, the duration of the gathering and the extent to which high-risk activities are engaged in. Walter Decl., Ex. A [Rutherford Report] at ¶ 44. The risk further increases when the gathering includes activities involving substantial or increased exhalation such as, for example, loud vocalization or verbal interactions, heavy breathing from exertion (as when engaging in exercise or sports) and singing. *Id.*, ¶ 45. These activities increase the emission of large respiratory droplets and of small aerosolized particles that may contain the virus, and are believed to increase the distance they can travel. *Id.* In addition, the more particles that are released from an infected person and reach to a non-affected person, the higher likelihood the other person will receive a viral load sufficient to overcome his or her body's defenses and cause a COVID-19 infection. *Id.* The likelihood of

---

[5] *See* Center for Disease Control and Prevention, COVID-19 Mortality Overview, https://www.cdc.gov/nchs/covid19/mortality-overview.htm (last accessed May 31, 2022)

1  spreading the COVID-19 virus and thereby causing serious illness is higher when a gathering

2  takes place in a county where the virus is being highly transmitted than in a county where this is

3  not the case. *Id.*, ¶ 46.

4    **B.    The State's Response to the COVID-19 Outbreak**

5    On March 4, 2020, California Governor Gavin Newsom proclaimed a state of emergency in

6  response to the spread of COVID-19. Defs.' Req. for Jud. Notice (RJN) Ex. 1. On March 19,

7  2020, Governor Newsom issued Executive Order N-33-20 ("Stay-at-Home Order"), directing

8  Californians "to immediately heed" the State Public Health Officer's directives to stay at home.

9  Decl. of James W. Walter ("Walter Decl."), Ex. A [Rutherford Report] at ¶ 66 & Ex. 31. The

10  Stay-at-Home Order incorporated a separate order from the State Public Health Officer directing

11  Californians to stay home except as necessary to provide or obtain services determined to be

12  necessary for critical infrastructure. *Id.* [Rutherford Report], Ex. 31. Governor Newsom

13  instituted this measure to prevent widespread virus transmission through indoor gatherings,

14  "flatten the curve" of new infections, and reduce strain on the State's hospitals. *Id.* [Rutherford

15  Report], ¶ 68.

16    On May 4, 2020, the Governor issued Executive Order N-60-20, which directed the public

17  health officer to develop a framework to allow local public health officers to "establish and

18  implement public health measures less restrictive" than the earlier, statewide measures. Defs.'

19  RJN Ex. 2. That same month, the California Department of Public Health (CDPH) issued

20  guidelines contemplating the phased reopening of businesses and activities during "Stage 2" of

21  the pandemic response, including "opening more public spaces." Walter Decl., Ex. A

22  [Rutherford Report] at ¶ 69 & Ex. 32 at pp. 5, 7-8. The guidelines identified key indicators for

23  readiness to enter "Stage 2" readiness, including sufficient capacity to hospitalize COVID

24  patients, as well as testing and PPE capacity to meet demands. *Id.* [Walter Decl., Ex. A,

25  Rutherford Report], Ex. 32 at pp. 7-8.

26    On May 7, 2020, the State Public Health Officer issued a further order clarifying that

27  residents were not literally required to stay at home at all times, as counties were permitted to

28  begin moving into Stage 2 of the State's pandemic response. Defs.' RJN, Ex. 13. Stage 2 called

4

1   for the gradual reopening of higher risk work places and other "public spaces." *Id.* The order

2   sought to "reintroduce activities and sectors in a phased manner and with necessary

3   modifications, in order to protect public health and result in a lower risk for COVID-19

4   transmission and outbreak in a community." *Id.* The order expressly stated, "Californians may

5   leave their homes to work at, patronize, or otherwise engage with those businesses,

6   establishments, or activities and must, when they do so, continue at all times to practice physical

7   distancing, minimize their time outside of the home, and wash their hands frequently." *Id.*

8        On August 28, 2020, CDPH issued another statewide order updating the criteria for re-

9   opening businesses and modifying restrictions. Defs.' RJN Ex. 3. Through this order, which

10   gave rise to the Blueprint for a Safer Economy, each county was assigned a tier based on its

11   number of new COVID-19 cases and positivity rate. *Id.* These adjustments to the State's public

12   health directives accounted for evolving scientific understanding of the novel coronavirus, factors

13   contributing to its transmission, and "the proportion of testing and other COVID-19 response

14   efforts addressing the most impacted populations within a county." *Id.*

15        Between November 2020 and March 2021, California and much of the country experienced

16   an alarming spike in cases that was more severe than at any earlier point in the pandemic and that

17   threatened to overwhelm hospital resources in many areas of California and the United States.

18   Walter Decl., Ex. A [Rutherford Report] at ¶ 34. To illustrate, between January 9 and 16, 2021,

19   the number of deaths in the United States rose to over 3,600 per day (based on a 7-day average)

20   and the number of deaths in California rose to over 700 per day. *See Id.*, Ex. 9. Despite this

21   surge, Defendants did not re-impose any restrictions prohibiting Californians from gathering

22   outdoors.

23        On December 11, 2020, the Food and Drug Administration (FDA) granted the first

24   emergency use authorization of a COVID-19 vaccine, authorizing use of the Pfizer-BioNtech

25   vaccine for people ages 16 and older. Defs.' RJN Ex. 4. Since then, FDA has also granted

26   emergency use authorization of vaccines from Moderna and Johnson & Johnson, and has also

27   authorized vaccinations of children ages 12 and older with the Pfizer vaccine. *Id.*, Exs. 5, 6, 7.

28   On August 23, 2021, FDA issued full approval of the Pfizer vaccine for people ages 16 and older.

1  *Id.*, Ex. 8.  As of April 29, 2022, over 74,800,000 doses of vaccine had been administered in

2  California.  *Id.*, Ex. 9.  The vaccines do two things.  First, as more and more Californians have

3  been vaccinated, the risk of any particular Californian being infected with COVID-19, and the

4  risk of an infected person transmitting it to another person, have each decreased.  Walter Decl.,

5  Ex. A [Rutherford Report] at ¶¶ 56, 57.  Second, the risk of death or severe illness for those who

6  have been vaccinated decreases, even among those who are infected despite their vaccination—

7  thus mitigating prior concerns about hospital systems being overwhelmed by severely sick

8  patients.  *Id.* ¶¶ 54, 56.

9       In light of widespread vaccination and the diminished threat of COVID-19 patients

10  overwhelming the State's healthcare system, Governor Newsom and CDPH have since

11  dismantled the framework of orders restricting activity during the pandemic.  On June 11, 2021,

12  Governor Newsom issued Executive Order N-07-21, which, effective June 15, 2021, formally

13  rescinded the orders that Plaintiffs challenge: (i) the Stay-at-Home Order, and (ii) Executive

14  Order N-60-20, the May 4, 2020 order directing the State Public Health Officer to issue a risk-

15  based framework for reopening the economy and that gave rise to the Blueprint.  Defs.' RJN Ex.

16  10.  Even with the recent dramatic surge in cases fueled by the omicron variant of COVID-19, the

17  State has not reinstituted the earlier public health measures.

18  **II.   TIMELINE OF CHANGES TO THE CAPITOL GROUNDS PERMITTING PROCESS BASED
       ON COVID-19 SAFETY MEASURES.**

19

20       Acting under the general guidance from CDPH, CHP began to deny permits for

    demonstrations on the State Capitol grounds for a one-month period from April 21, 2020 through
21
    May 24, 2020.  Walter Decl., Ex. D [Lyons Decl. ¶ 6, ECF No. 14 at 2-3]; Walter Decl. Ex. F
22
    [Lyons Decl. ¶ 3, ECF No. 33-2 at 2].  At the time, there was a 7-day average of 1,510 cases per
23
    day and 79.1 deaths per day in California.  Walter Decl., Ex. A [Rutherford Report] at ¶ 71.
24
    Trends in Sacramento County were worse than the state average at that time, *id.*, and on May 1,
25
    2020, the Sacramento County Health Officer issued a modified stay-at-home order that applied to
26
    all residents of the County.  *See id.* ¶ 70 & Ex. 33.  Among other things, it extended the existing
27
    stay-at-home order and provided greater clarification regarding outdoor gatherings.  *Id.*
28

6

1    Specifically, it ordered residents "to stay at home or place of residence. To the extent individuals

2    are using shared or outdoor spaces, they must at all times, as reasonably possible, maintain social

3    distancing of at least six feet from any other person when they are outside their residence. All

4    persons may leave their residences only for Essential Activities, Essential Governmental

5    Functions, or to operate Essential Businesses . . . ." *Id.*, Ex. 33.

6         During this one-month period, CHP denied two permit requests for events on State Capitol

7    grounds submitted by Plaintiffs. Plaintiff Bish sought to hold a campaign rally on the State

8    Capitol grounds on Saturday, May 2, 2020, with an estimated 500 attendees. Compl., ECF 1,

9    ¶¶ 43-45, ECF 12, Ex. A. Plaintiff Givens sought to hold a protest rally on the State Capitol

10   grounds on Sunday, May 3, 2020, with 1,000 expected attendees. ECF 1 at ¶¶ 31-34; ECF 12,

11   Ex. B

12        CHP denied permits for events at the Capitol during this early period of the pandemic to

13   decrease the risk of transmission in large crowd events while the science of COVID-19

14   transmission was being determined. Walter Decl., Ex. A [Rutherford Report], ¶ 71. A protest by

15   people who disagreed with COVID-19 restrictions at the Capitol grounds on April 20, 2020,

16   where numerous unmasked demonstrators, who did not follow social distancing instructions and

17   refused lawful commands to disperse, demonstrated the difficulty associated with allowing large-

18   scale events on the grounds, while also adhering to mandatory public health orders. *Id.*; Walter

19   Decl., Ex. D [Lyons Decl. ¶¶ 4-6, ECF No. 14 at 2-3]; Walter Decl., Ex. F [Lyons Decl. ¶ 3, ECF

20   No. 33-2 at 2]; Walter Decl., Ex. C [Dep. Transcript Officer Paul Moos at pp. 29:22-37:24, 57:12-

21   18]; Walter Decl., Ex. E [Dep. Transcript CHP Capt. Douglas Lyons at pp. 27:18-29:18]. Similar

22   circumstances arose on May 1, 2020, during an unpermitted event on the grounds at which 32

23   individuals were arrested. Walter Decl., Ex. A [Rutherford Report] at ¶ 71; Walter Decl., Ex. G,

24   [Lyons Decl. ¶ 11, ECF No. 35-2 at 3-4]; Walter Decl., Ex. C [Dep. Transcript Officer Paul Moos

25   at pp. 29:22-37:24]; Walter Decl., Ex. E [Dep. Transcript CHP Capt. Douglas Lyons at p. 54:11-

26   58:19].

27        On May 24, 2020, just over a month after it began denying permits, CHP, following new

28   guidance from CDPH, began to grant permits for demonstrations on the State Capitol grounds

                                          7

again.  Walter Decl., Ex. D [Lyons Decl. ¶ 8, ECF No. 33-2 at 2-3].  From May 25 to June 11, 2020, permits were issued with an attendance cap of 100 persons. [6] (*Id.* at ¶¶ 10, 11, ECF No. 33-2 at 3.)  CHP continually reevaluated its approach to permitting to conform with applicable health orders.  Walter Decl., Ex. E [Dep. Transcript CHP Capt. Douglas Lyons at p. 63:21-24].  From June 12 until September 24, 2020, there were no attendance caps.  Walter Decl., Ex. G, [Lyons Decl. ¶¶ 14, 15, ECF No. 35-2 at 4].  Then, with a new surge in cases, and considering new CDPH guidance, on September 25, 2020, attendance caps were set at 200 persons per event or 250 people total at multiple events on Capitol grounds, where they remained until June 2021.  Bart Decl. ¶ 3, ECF No. 77 at 21; Walter Decl., Ex. A [Rutherford Report] at ¶ 71.

In setting the caps, CHP measured the grounds to determine capacity with social distancing.  Walter Decl., Ex. E [Dep. Transcript CHP Capt. Douglas Lyons at p. 36:10-14].  The attendance caps decreased the number of participants allowed into a fixed space, decreasing the density of the crowd, and reducing the risk of transmission. Walter Decl., Ex. A [Rutherford Report] at ¶ 71; Walter Decl., Ex. E [Dep. Transcript CHP Capt. Douglas Lyons at pp. 36:2-37:9].  This, of course, assumed social distancing between participants, but decreasing the density of participants improved the ability to maintain adequate social distancing.  Walter Decl., Ex. A [Rutherford Report] at ¶ 71; Walter Decl., Ex. E [Dep. Transcript CHP Capt. Douglas Lyons at pp. 36:2-37:9].

After Governor Newsom rescinded key executive orders, on June 16, 2021, CHP eliminated any attendance restrictions on permitted events due to COVID-19.  Walter Decl., Ex. A [Rutherford Report] at ¶ 59; ECF No. 77 at 21[Bart Decl. ¶ 4]; Defs' RJN, Ex. 10.  Thus, the only time during which permits were not allowed for the Capitol grounds was the approximately one-month period of suspension from April 21 through May 24, 2020, during the earliest stages of the pandemic, and no attendance caps have been in place since June 2021.

---

[6] Plaintiffs do not challenge the constitutionality of these attendance caps in their complaint.  The caps are discussed above to illustrate all iterations of permitting restrictions during the pandemic, and the general progression from more to less restrictive, in conformity with applicable public health orders.

8

Defs.' Notice of Cross-Mot. and Cross-Mot. for Summ. J.; Mem. P & A (2:20-cv-00852)

### III.   THE PRESENT LAWSUIT

#### A.   The Complaint

On April 27, 2020, Plaintiffs Ron Givens and Christine Bish filed a complaint against the Governor, Attorney General, State Public Health Officer, and CHP Commissioner alleging that the Stay-at-Home Order on its face violated Plaintiffs' rights to freedom of speech, freedom of assembly, and to petition the Government under the U.S. Constitution because it "provide[d] no exception for demonstrations, protests, or other First Amendment protected activities, thereby effectively banning all gatherings of any size for the purpose of protesting or petitioning the government."[7] Compl. ¶ 20, ECF 1. The complaint also challenges the constitutionality of the Stay-at-Home Order as it applies to Plaintiffs through CHP's actions denying their individual permit applications.[8] *Id.*, ¶¶ 10-13, 50-72. The complaint also alleges that the Stay-at-Home Order is void for vagueness in violation of the Due Process Clause of the Fourteenth Amendment. *Id.*, ¶¶ 73-81. By way of relief, the complaint requests "a declar[ation] that the State (Order (referring to the Stay at Home) Order), facially and as-applied to Plaintiffs, violates the First and Fourteenth Amendments to the U.S. Constitution" and an injunction "prohibiting Defendants from enforcing the State (Stay at Home) Order or otherwise interfering with Plaintiffs ability to exercise constitutionally protected rights." Compl., p. 19, ECF 1.

#### B.   Procedural History

In April 2020, Plaintiffs applied for an order temporarily restraining Defendants from enforcing the Stay-at-Home Order, and compelling them to allow demonstrations, rallies, and

---

[7] The complaint's other causes of action under the California Constitution have been dismissed on Eleventh Amendment grounds. Minute Order, ECF 44.

[8] The complaint is ambiguous as to the scope of its First Amendment claims. In paragraph 2, it purports to "assert facial and as-applied challenges" to the Stay-at-Home Order (but not CHP's individual permit decisions), and its prayer for relief is likewise directed only at the Stay-at-Home Order. Compl. ¶ 2 & p. 19, ECF 1. But elsewhere, in paragraph 50, it alleges that plaintiffs challenge both the Stay-at-Home Order "and Defendants' enforcement thereof . . . both facially and as-applied to Plaintiffs." *Id.*, ¶ 50, ECF 1. For completeness, this memorandum addresses both Plaintiffs' facial challenge to the Stay-at-Home Order, and their as-applied challenge to the Stay-at-Home Order based on CHP's denials of their individual permit applications. (Of course, because CHP's denials of Plaintiffs' permit applications are by their nature directed to Plaintiffs individually, those denials cannot themselves give rise to a facial challenge.)

1    other events to take place on Capitol grounds.  This Court denied Plaintiffs' application, finding

2    that Plaintiffs "failed to demonstrate a likelihood of success on the merits of their claims because

3    the State order, and the CHP's denial of their permit applications, are within the scope of the

4    State's emergency powers to fight the spread of COVID-19."  Order dated May 8, 2020, ECF 18,

5    at 7.[9]

6        Following the issuance of health orders in May 2020 clarifying that in-person events may

7    be held on the Capitol grounds, Defendants moved to dismiss the complaint as moot.  Ruling

8    from the bench on July 20, 2020, the Court declined to dismiss the entire action on grounds of

9    mootness.  Relying on the voluntary cessation doctrine, the Court found that the State did not

10    meet its burden to show that a ban on events at the Capitol based on the COVID-19 pandemic

11    was not reasonably likely to recur.  Hearing Tr., ECF No. 45 at 15-18.

12        CHP did not reinstate the ban, and after Governor Newsom rescinded the Stay-at-Home

13    Order on June 15, 2021, Defendants renewed their motion to dismiss on mootness grounds.

14    Defs.' Mot. to Dismiss, ECF No. 77.  The Court again denied the motion, finding that, in the

15    absence of controlling Ninth Circuit authority, "Plaintiffs remain under threat that Defendants

16    will reinstate the challenged restrictions as the COVID-19 pandemic persists."  MTD Order dated

17    Oct. 5, 2021, ECF 86, at 6-7.

18        On April 26, 2022, Plaintiffs moved for summary judgment on their three First Amendment

19    claims, but not their due process claim.  Focusing on their facial challenge to the Stay-at-Home

20    Order, Plaintiffs' motion contends that the Stay-at-Home Order is presumptively invalid under the

21    Free Speech Clause because it proscribes of political speech in a public forum entitled to stronger

22    First Amendment protections, and because it operates as a prior restraint on speech.  (Mem. of

23    Pts. and Authorities in Supp. of Pls.' Mot. for Summ. J. ("Pls.' Mem."), ECF 92-1, at 7-9.

24    Plaintiffs' motion also argues that the Stay-at-Home Order is content-based, and that it fails

25    intermediate (as well as strict) scrutiny for want of narrow tailoring and failure to preserve

26    alternative channels for communication—even though Plaintiffs concede the strength of the

27        [9] The Court's order denying Plaintiffs' application for a temporary restraining order has

28    been published.  *Givens v. Newsom*, 459 F.Supp.3d 1302 (E.D. Cal. 2020).  Citations in this brief
   will be to the Court's order, ECF No. 18.

1    States' interest in controlling the spread of COVID and protecting the health of its most

2    vulnerable residents. *Id.*, pp. 9-16. Plaintiffs' motion asserts that their as-applied free speech

3    challenge should be granted for the same reasons as their facial challenge. *Id.*, p. 17. With

4    respect to the free assembly claim, Plaintiffs' motion contends that the Stay-at-Home Order fails

5    the least-restrictive-means test under strict scrutiny, both facially and as applied, by operating as a

6    complete ban on assembly for purposes of political demonstrations while permitting other public

7    activities not entitled to constitutional protection. *Id.*, pp. 18-19. Finally, the motion argues that

8    the Stay-at-Home Order violates the petition clause because it prohibits a direct and visible means

9    of petitioning state lawmakers and thus lacks narrow tailoring. For the reasons set forth in this

10    opposition and cross-motion, Plaintiffs' arguments fail.

11                                       **LEGAL STANDARD**

12    A court must grant summary judgment in favor of a moving party that shows there is no genuine

13    dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ.

14    P. 56. There is no genuine issue of fact where the record, taken as a whole, could not lead a

15    rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*

16    *Corp.*, 475 U.S. 574, 586 (1986). Conversely, a genuine dispute over a material fact exists if

17    there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to

18    resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253

19    (1986).

20                                            **ARGUMENT**

21    **I.**    **PLAINTIFFS' FIRST AMENDMENT CLAIMS FAIL BECAUSE THE BRIEF MORATORIUM**
22            **WAS NECESSARY TO PROTECT THE PUBLIC AND NARROWLY TAILORED TO**
                **EVOLVING CIRCUMSTANCES.**

23    As this Court has recognized, the State's ban on large public gatherings"flows from a larger

24    goal of substantially reducing in-person interactions." ECF 18, Order Denying Plaintiff's

25    Application for Temporary Restraining Order (hereafter, "TRO Order") at 10. As this Court also

26    found in its order denying Plaintiffs' application for a temporary restraining order, "[i]n this case

27    it is uncontroverted that the State's stay at home order bears a real and substantial relation to

28    public health." TRO Order at 9. Because the orders of the Governor and the CDPH, and their

11

1  application to the Capitol grounds by the CHP, were reasonable, content-neutral time, place and

2  manner restrictions that satisfy the appropriate level of scrutiny, each of Plaintiffs' three First

3  Amendment Claims—speech, assembly, and petition—fails to present a triable issue of fact and

4  should be dismissed.

5      **A.    CHP's Temporary Denial of Permits Applications Was a Permissible**
       **Content-Neutral Time, Place, and Manner Restriction That Did Not**
6      **Violate Plaintiffs' Right to Freedom of Speech or Assembly**

7          The analysis of free speech and free assembly claims is the same. *See Ward v. Rock*

8  *Against Racism*, 491 U.S. 781, 797-98 (1989) (noting the standards for both categories of claims).

9  Regulations that burden First Amendment rights are not subject to strict scrutiny if they are

10  content-neutral; they are instead classified as time, manner, and place restrictions, and are subject

11  to intermediate scrutiny. *See Jacobs v. Clark Cty. Sch. Dist.*, 526 F.3d 419, 434 (9th Cir. 2008);

12  *see also Ward*, 491 U.S. at 791 ("[E]ven in a public forum the government may impose

13  reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions

14  'are justified without reference to the content of the regulated speech, that they are narrowly

15  tailored to serve a significant governmental interest, and that they leave open ample alternative

16  channels for communication.").

17          **1.    CHP's temporary restrictions  were content-neutral**

18          CHP's permit denials in April and May 2020 were unrelated to the content of any speech.

19  As the Court recognized in its order denying plaintiffs' application for temporary injunctive

20  relief:

21          The State's order, and the resulting moratorium on permits, are, beyond question,
           content-neutral. Pursuant to the State's order, the CHP is temporarily denying all
22          permits for any in-person gatherings at the State Capitol. *See* Ex. A to Opp'n ¶ 10.
           By definition, "blanket bans applicable to all speakers are content-neutral." *Santa*
23          *Monica Nativity Scenes Comm. v. City of Santa Monica*, 784 F.3d 1286, 1295 n.5
           (9th Cir. 2015).
24

25  TRO Order at 12.  Because all permits were prohibited, the policy necessarily was content-

26  neutral.

27

28

                                                    12

### 2.    CHP's temporary restrictions were narrowly tailored

Under the narrow tailoring requirement for time, place and manner restrictions, the regulation must not "burden substantially more speech than is necessary" to achieve a substantial government interest. *Ward*, 491 U.S. at 799. But the government "need not [use] the least restrictive or least intrusive means" available to achieve its legitimate interests. *Id.* at 798; *see also* Order Denying TRO, ECF 18, at 13. The temporary restrictions on permits at the Capitol satisfied this standard, and there is no material dispute of fact that could yield a different conclusion.

CHP's permit suspensions affected only in-person gatherings, and not any other form of speech, including mailings, social media, broadcasts, or even car caravans near the Capitol. The moratorium was strictly time-limited: It applied only for a limited one-month period, at a time when there were no vaccines and authorized medical interventions. (Walter Decl., Ex. A [Rutherford Report] ¶¶ 71-74.)

Plaintiffs contend that Defendants could have allowed demonstrations at the Capitol to continue during the early days of the pandemic by imposing alternative requirements such as masking, attendance limits, or social distancing requirements. Pls.' Mem., ECF 92-1, at 14. But "[r]estrictions on the time, place, or manner of protected speech are not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.'" *Ward*, 491 U.S. at 797. And such measures would indisputably have been less effective as simply prohibiting public gatherings until the danger subsided—especially considering that Plaintiffs anticipated that as many as 500 to 1,000 people would attend their respective events. Walter Decl., Ex. A, Rutherford Report, ¶¶ 71-72; ECF 12, Ex. A; ECF 12, Ex. B. Whenever a large group of people interact, the risk of spreading COVID-19 increases. Walter Decl., Ex. B [Watt Decl.] at ¶ 15; Walter Decl. [Rutherford Report] at ¶¶ 71-72. As this Court previously found, "[t]he evidence before this Court clearly demonstrates that in-person gatherings increase the spread of COVID-19." TRO Order at 13. This is true even when people attempt to comply with the CDC's recommendations with respect to masks and distancing. *Id.* (citing Decl. of James Watt in Support of Defs.' Opp. to TRO App., ECF 13, at ¶ 17 ["Even if some precautions are taken

13

1    initially during [Plaintiffs'] protest, maintaining six feet of distance and masking are not perfect

2    and are difficult to maintain for long periods of time, particularly in a large group setting."])

3    Moreover, CHP had just attempted Plaintiffs' preferred approach without success; the April 20,

4    2020 demonstration, at which there was widespread noncompliance with the public health

5    requirements around distancing, underscored that reliance on attendees' compliance with such

6    measures would be inadequate. (Walter Declaration, Ex. A [Rutherford Report] at ¶ 71.)

7         When analyzed in the particular context of the opening stages of a deadly worldwide

8    pandemic, the narrow tailoring of the restrictions is even more clear. They lasted only one month.

9    During that time, public health officials were attempting to determine the safest course to prevent

10   spread of the disease. Given the known means of transmission—droplets by infected persons in

11   close contact—gatherings of large groups of people would have been dangerous, temporarily

12   halting crowds gathering on the Capitol grounds was a necessary course for officials to take.

13   Order Denying TRO, ECF 18, at 14. Knowledge of treatment options for those afflicted with

14   COVID-19 was minimal in April 2020, and people who contracted this virus in 2020 died in

15   astonishing numbers before vaccines were widely available. The State's orders prevented

16   hospitals from being overwhelmed with patients and undoubtedly slowed the spread of this virus.

17   Walter Decl., Ex. A [Rutherford Report] at ¶¶ 72-74. These concerns extended not only to the

18   safety of persons participating in protests, but also for the safety of people who would interact

19   with those present at the Capitol during the protests. Walter Decl., Ex. B, [Watt Decl,. ¶10].G

20   [Lyons Decl. ¶ 3-5l]. And there was the danger that participants who lived outside the

21   Sacramento area would spread the disease to others throughout the state when they returned

22   home, straining health care systems in other counties, a significant concern. *See* Walter Decl.,

23   Ex. A [Rutherford Report] at ¶¶ 71-72. Plaintiffs have not designated any expert witness that

24   challenges the comprehensive and considered opinions of Defendants' experts and public health

25   authorities that the temporary prohibition was an appropriate and tailored response under the

26   circumstances and based on the information available at the time.

27        The CHP's response was not unique: Other governmental authorities responded similarly

28   to the increased risks posed by group gatherings. For example, the National Park Service banned

14

1    permitted events at the National Mall due to COVID in May and June of 2020.  Defs.' RJN Ex.

2    14.

3         Even where life and death are not at stake, large gatherings can raise safety concerns on

4    public property. The State has a strong interest in ensuring the safe use of public spaces. *See*

5    *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1043 (9th Cir. 2006)

6    (recognizing "significant" governmental interests, and holding that "[g]roups of 150 or more,

7    whether demonstrating or playing soccer, are by any measure sufficiently large enough to affect

8    or have an impact on the use of [the City's] public spaces by other citizens and therefore to

9    implicate the City's interest in maintaining the safe and compatible use of limited public open

10   space."); *see also Thomas v. Chicago Park Dist.*, 534 U.S. 316, 322 (2002) (government's

11   objective "is not to exclude communication of a particular content, but to . . . prevent uses that are

12   dangerous.")

13        Additionally, in assessing narrow tailoring, federal courts "must afford substantial

14   deference to state and local authorities about how best to balance competing policy considerations

15   during the pandemic." *Roman Cath. Diocese of Brooklyn v. Cuomo*, __ U.S. __, 141 S. Ct. 63, 74

16   (2020) (Kavanaugh, J., concurring); *see also Ward*, 491 U.S. at 798-99 ("the government's

17   judgment as to the best means for achieving its legitimate objectives deserves considerable

18   respect"); *Turner Broad. Sys., Inc. v. Fed. Comm. Com.*, 520 U.S. 180, 195-96 (1997).  This

19   policy further extends to other legislative and/or executive decisions on topics that involve

20   application of scientific principles.  "When Congress undertakes to act in areas fraught with

21   medical and scientific uncertainties, legislative options must be especially broad and courts

22   should be cautious not to rewrite legislation, even assuming, arguendo, that judges with more

23   direct exposure to the problem might make wiser choices." *Marshall v. United States*, 414 U.S.

24   417, 427 (1974).  Especially in light of the uncertainty around COVID-19, the rapidly evolving

25   scientific understanding in the earliest days of the pandemic, and the deference therefore due to

26   the judgments of state officials, there is no material dispute of fact as to whether the policies

27   challenged here are narrowly tailored.

28

1       In sum, the State's Stay-at-Home Order advanced the best method of preventing the rapid

2   spread of an air-borne virus from spreading at in-person gatherings:  prohibiting in-person

3   gatherings.

4       **3.**    **CHP's restrictions on permits left open ample alternative channels of**

5              **expression**

6       Nor is there any genuine dispute that CHP's one-month suspension of permits left open

7   alternative channels by which Plaintiffs could express their views.  A temporary moratorium on

8   the issuance of CHP permits did not foreclose all channels of communication at the time.

9   Plaintiffs remained free to use online and other electronic media to stage their rallies and make

10   their protests.  As this Court has held, "given much of [Plaintiffs'] intended audience [wa]s home

11   at the time, this may [have been] a more effective way of communicating their messages."  Order

12   Denying TRO, ECF 18, at 16.  Further, Plaintiffs could have planned in-car protests without

13   violating COVID-19 restrictions then in place.

14       Plaintiffs acknowledge the availability of these other channels but contend that they are not

15   "suitable" alternatives to an in-person protest.  The authorities on which Plaintiffs rely do not

16   support this conclusion:  All but one—*Menotti v. City of Seattle*, 409 F.3d 1113 (2005)—

17   considered restrictions intended to be of indefinite duration.  *Menotti*, which upheld an emergency

18   order completely banning public protest within a designated forum to maintain public safety in

19   during a global conference, supports the narrow tailoring of the CHP's permit suspension on the

20   Capitol grounds.  And all but one—*Roman Catholic Diocese of Brooklyn*—did not occur in the

21   context of a pandemic.  In *Roman Catholic Diocese*, the Court issued preliminary injunctive relief

22   upon finding that persons required to participate in religious services remotely on account of

23   pandemic-related health orders would be irreparably harmed because "Catholics who watch a

24   Mass at home cannot receive communion, and there are important religious traditions in the

25   Orthodox Jewish faith that require personal attendance."  141 S. Ct. at 68.  These faith-related

26   free exercise concerns are not at issue here.

27       Plaintiffs acknowledge that the First Amendment does not require government "to provide

28   speakers their first choice of their mode of expression."  Pls.' Mem., ECF 92-1, at 16.  Yet

1    Plaintiffs' only issue with the alternative channels of communication available to them, apart

2    from the fact that they are different from an in-person demonstration, is that they do not allow

3    demonstrators "'to reach their intended audience'—i.e., state lawmakers." Pls.' Mem., ECF 92-1,

4    at 16, *quoting Edwards v. Coeur d'Alene*, 262 F.3d 856 (2001). Plaintiffs' argument ignores the

5    fact that both houses of the State Legislature were in an unscheduled, COVID-related recess—

6    and working remotely—during the period when both of their events at the Capitol would have

7    taken place. Defs.' RJN, 15-17; *see also* CalMatters, "'Hella connected': How California

8    lawmakers are governing from home," Apr. 8, 2020, available at

9    https://calmatters.org/health/coronavirus/2020/04/coronavirus-california-legislature-working-

10   from-home-remote-government/ (as of May. 30, 2022). This is far afield of the circumstances in

11   *Edwards v. Coeur d'Alene*, 262 F.3d 856 (2001), which invalidated an ordinance that proscribed

12   picketing during parades and public assemblies. In so holding, the Ninth Circuit expressly found

13   alternative channels of communication such as shouting, leafletting, or holding small signs, were

14   rendered ineffective in the particular context of a parade or public assembly, where the would-be

15   picketers messaging would "lack force" on account of "large crowds and significant noise." 262

16   F.3d at 867.

17       Because Plaintiffs cannot counter the State Defendants' showing that the restrictions on use

18   of the Capitol grounds were anything other than reasonable content-neutral restrictions, imposed

19   to save lives in the midst of a deadly pandemic, their First Claim for Relief under the Free Speech

20   Clause and Third Claim under the Right to Assembly Clause should be dismissed.

21       **B.    The Stay-at-Home Order Is Also Content-Neutral and Narrowly Tailored
               to Advance a Significant Governmental Interest**

22

23       Plaintiffs fail to establish that the Stay-at-Home Order was invalid on First Amendment

24   grounds, either facially or as applied to the extent that it prevented them from hosting in-person

25   gatherings at the State Capitol in April and May of 2020. Both facial and as-applied challenges

26   fail. This order was rescinded in June 2021, and for almost the entire time that it was in place,

27   CHP has allowed permitted activities on State Capitol grounds. Nonetheless, even as limited to

28   the time of the suspension, their argument fails under both facial and as-applied analysis.

17

1    To succeed on a facial challenge, a plaintiff must show there is "no set of circumstances"

2    under which the law could be constitutionally applied. *United States v. Salerno*, 481 U.S. 739,

3    745 (1987); *Italian Colors Rest. v. Becerra*, 878 F.3d. 1165, 1174-1175 (9th Cir. 2018).

4    Alternatively, a plaintiff must show that the restrictions seek "to prohibit such a broad range of

5    protected conduct that [they are] unconstitutionally overbroad." *Lone Star Security and Video v.*

6    *City of Los Angeles*, 827 F.3d 1192, 1197 (9th Cir. 2016). Plaintiffs have not met that burden

7    under either test.

8    First, the Stay-at-Home Order, on its face, did not regulate speech. Rather, it directed all

9    Californians to stay at their place of residence except to provide or obtain services designated as

10   critical infrastructure, As such, it is directed at conduct, not speech, and thus is subject to rational

11   basis review. *See Homeaway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 685 (9th Cir.

12   2019) (restriction on "nonspeech, nonexpressive conduct" does not implicate First Amendment,

13   receives rational basis scrutiny); *Animal Legal Defense Fund v. Wasden*, 878 F.3d 1184, 1194

14   (9th Cir. 2018) ("If the government's actions do not implicate speech protected by the First

15   Amendment, we need go no further"). Plaintiffs do not—and cannot—deny that the restrictions

16   on gatherings are a rational way to reduce the spread of COVID-19. *See generally* Pls.' Mem,

17   ECF 92-1. For this reason alone, Plaintiffs' First Amendment challenge to the Stay-at-Home

18   Order fails.

19   But even if the restrictions on gatherings were deemed to affect speech, summary judgment

20   would still be appropriate because there is no material dispute of fact that any such effect was

21   incidental. A rule that regulates conduct but incidentally burdens expression is reviewed under

22   intermediate scrutiny "to see whether it advances important governmental interests unrelated to

23   the suppression of free speech and does not burden substantially more speech than necessary to

24   further those interests." *Pacific Coast Horseshoeing School, Inc. v. Kirchmeyer*, 961 F.3d 1062,

25   1068 (9th Cir. 2020) (internal quotations omitted). This is the same standard used for time, place,

26   and manner restrictions. *Id.*; *see also Ward*, 491 U.S. at 796. The Stay-at-Home Order easily

27   satisfies these requirements.

28

18

Defs.' Notice of Cross-Mot. and Cross-Mot. for Summ. J.; Mem. P & A (2:20-cv-00852)

1     "[T]he crucial first step in the content-neutrality analysis" is "determining whether the law

2     is content neutral on its face." *Reed v Town of Gilbert, Ariz.*, 135 S.Ct. 2218, 2222 (2015).

3     Where "[t]he text of [ a law] is neutral . . . concerning any speaker's point of view," the law is

4     content neutral on its face. *Members of City Council of City of Los Angeles v. Taxpayers for*

5     *Vincent*, 466 U.S. 789, 804 (1984).  In contrast, "[a] government's restriction on 'speech is

6     content based if a law applies to particular speech because of the topic discussed or the idea or

7     message expressed." *In re Nat'l Sec. Letter*, 863 F.3d 1110, 1122 (9th Cir. 2017).  The Stay-at-

8     Home Order at issue in this case did not regulate speech as such—instead it regulated *gatherings*

9     whether or not they involved speech.  And to the extent it restricted speech, did not do so on the

10    basis of the content of that speech.  The Stay-at-Home Order did not target a particular speaker or

11    group of speakers, but applied broadly to the entire population of the State, and it did not draw

12    distinctions based on the message to be expressed at a particular gathering.

13        A court must also evaluate whether "the purpose and justification for the law are content

14    based" in order to determine whether the law is, in fact, content neutral. *Reed*, 135 S.Ct. at 2228.

15    "Only if a law is content neutral on its face should a court proceed to consider whether it is

16    nevertheless a content-based regulation of speech because it 'cannot be justified without reference

17    to the content of the regulated speech, or [was] adopted by the government because of

18    disagreement with the message [the speech] conveys."' *In re Nat'l Sec. Letter*, 863 F.3d at 1123;

19    *see* TRO Order at 12-13.  *Here*, the purpose of the Stay-at-Home Order is clear: to stop the spread

20    of the coronavirus, protect the public health, and avoid a situation in which hospitals and health

21    care providers are overwhelmed.  Plaintiffs do not allege that the Stay-at-Home Order targeted

22    any particular message or speaker, or was implemented because the Defendants disagree with

23    Plaintiffs' message.  To the extent the Stay-at-Home Order burdened any speech, it did so without

24    regard to its content.  As such, it is subject to an intermediate level of scrutiny.

25        Plaintiffs contend that the Stay-at-Home Order's exemption for journalists meant the State

26    was selectively allowing some categories of critical infrastructure workers to engage in speech

27    activities based on their identity.  To the contrary, the Stay-at-Home Order distinguished among

28    activities according to their risk, not based on the identity of the speaker or content of their

19

1   speech.  Plaintiffs sought permits for in-person demonstrations of 500 to 1,000 people.  In

2   contrast, members of the news media can investigate stories, conduct interviews, write articles,

3   and broadcast the news in small groups, if not alone.  Permitted gatherings cannot fairly be

4   compared to activities "in which people neither congregate in large groups nor remain in close

5   proximity for extended periods."  *S. Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring in denial of

6   injunctive relief).  The State's public health experts had determined that such large gatherings of

7   individuals living in multiple geographic regions presented a greater risk of COVID and

8   appropriately distinguished between them on that basis.  Walter Decl., Ex B. [Watt Decl., ¶¶ 15-

9   18, ECF  13]; Walter Decl., Ex. A [Rutherford Report] at ¶ 71.  Indeed, other authorities,

10   including the federal government, responded similarly to the increased risks posed by group

11   gatherings by banning permitted events at the National Mall due to COVID in May and June of

12   2020.  *Id.*, ¶ 68, ¶¶ 70-72; Defs. RJN Ex. 14.  Accordingly, Plaintiffs fail to establish that the

13   Stay-at-Home Order is a content-based restriction on speech or assembly.

14        **C.    Although Strict Scrutiny Does Not Apply, the Stay-at-Home Order Would
               Survive Heightened Review Because It Is Narrowly Tailored**
15

16        Plaintiffs' contention that the Stay-at-Home Order should be evaluated under strict scrutiny

17   fails because, as established above (section I.B, *supra*), its impact on CHP's permitting decisions

18   for the Capitol grounds is at most a content-neutral restriction on the time, place and manner of

19   speech and assembly.  But even under the more rigorous standard of strict scrutiny, the Stay-at-

20   Home Order would survive review.

21        Strict scrutiny requires the State to prove that the challenged restriction "furthers a

22   compelling interest and is narrowly tailored to achieve that interest.'"  *Arizona Free Enter. Club's*

23   *Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (quoting *Citizens United v. Fed. Elec.*

24   *Comm'n*, 558 U.S. 310, 340 (2010)).  The Stay-at-Home Order withstands this level of review.

25   The State's interest in containing the spread of COVID-19 is beyond question.  Plaintiffs, for their

26   part, "do not dispute that the State has a substantial government interest" in containing the spread

27   of COVID-19 (Pls.' Mem., ECF 92-1, at 13), and limit their challenge to the narrow tailoring of

28   the Stay-at-Home Order.

20

Defs.' Notice of Cross-Mot. and Cross-Mot. for Summ. J.; Mem. P & A (2:20-cv-00852)

1    The State and Defendants have a compelling interest in protecting the public from the

2    spread of COVID-19. "Stemming the spread of COVID-19 is unquestionably a compelling

3    interest." *Roman Catholic Diocese of Brooklyn*, 141 S. Ct. at 68. "There is no question that

4    society has a compelling interest in fighting the spread of contagious diseases." *Whitlow*, 203 F.

5    Supp. 3d at 1089–90; *accord Workman v. Mingo Cty. Bd. of Ed.*, 419 Fed. Appx. 348, 353 (4th

6    Cir. 2011) (unpublished; ("[T]he state's wish to prevent the spread of communicable diseases

7    clearly constitutes a compelling interest."). Over 1,000,000 Americans, more than 95,000 of

8    whom were Californians, died from COVID-19 complications. *See* p. 3, *supra*. California took

9    action quickly with decisive measures instructing residents to stay at home. Prohibiting public

10   gatherings allowed the State to slow the spread of the disease, and provided hospitals and

11   healthcare officials with an opportunity to fight this disease without being overwhelmed. (Walter

12   Decl., Ex. A [Rutherford Report] at ¶ 68, ¶¶ 70-72.). Additionally, measures taken by California

13   and other states allowed time for scientists to develop vaccines to fight this pandemic. (Walter

14   Decl., Ex. A[Rutherford Report] at ¶¶ 73-74.) California thus had compelling interests in

15   combating COVID-19.

16   The Stay-at-Home Order's restrictions on public gatherings were narrowly tailored. Public

17   gatherings, especially prior to the development of vaccines for COVID-19, caused millions to

18   become infected. To stop the spread of COVID-19, the State needed to stop public gatherings.

19   This decision was not made lightly, nor was it intended to last longer than necessary. At the time

20   the Stay-at-Home Order was issued, the nation did not have vaccines to fight COVID-19. New

21   York and New Jersey hospitals were overwhelmed with COVID-19 cases early in the pandemic,

22   and the lack of treatment options often led to the infection of doctors and nurses due to the lack of

23   personal protective equipment available to healthcare workers.  [[See ECF no. 12, p . 19.] pp.

24   _____ )  CDPH correctly determined that public health required cancelling or postponing

25   gatherings to the maximum possible extent.[10]  This measure was temporary, lasting just one

26

27   [10] California Department of Public Health, CDPH Guidance for the Prevention of COVID-
     19 Transmission for Gatherings (March 16, 2020), available at
     https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-
28   19/CDPHGuidancefortthePreventionofCOVID19TransmissionforGatherings.aspx

21

1    month for CHP permits. At the time, there was no less restrictive measure that will be as

2    effective in curbing the transmission of COVID-19. Within a matter of weeks, State public health

3    officials gained knowledge regarding COVID's transmissibility and developed more precise

4    metrics for assessing relative risks based on an activity's type and location. These advances are

5    reflected in the phased reopening strategy discussed in the State Public Health Officer's order of

6    May 7, 2020. *See* Defs.' RJN Ex. 13; Walter Decl., Ex. A [Rutherford Report] at Ex. 32.

7    "The precise question of when restrictions on particular social activities should be

8    lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable

9    disagreement." *S. Bay United Pentecostal Church*, 140 S. Ct. at 1613 (Roberts, C.J., concurring).

10    The facts known to public officials early in this pandemic mandated temporary restrictions on

11    gatherings and permitted activities. As CHP learned firsthand at the April 20, 2020

12    demonstration, once a large, public gathering is underway, neither CHP nor the organizers of that

13    gathering could guarantee that those present would engage in physical distancing, wear masks, or

14    engage in other measures to protect public health. Walter Decl. , Ex. D [Declaration of Captain

15    Lyons dated May 4, 2020, ECF 14, at ¶¶ 3-5].

16    Plaintiffs contend conclusory that the Stay-at-Home Order is overinclusive because it

17    prevented all Californians from leaving their residences to engage in expressive activity, whether

18    individually or with members of the same household. Pls.' Mem., ECF 92-1, at 13-14. But that

19    is not the basis upon which Plaintiffs allege the order is unconstitutional as applied to them;

20    instead, they challenge it to the extent it prevented them from hosting permitted, in-person

21    demonstrations and rallies at the State Capitol. *See* Order Denying TRO, ECF 18, at 15. Further,

22    nothing on the face of the Stay-at-Home Order prohibits expressive conduct by individuals, and

23    Plaintiffs provide no evidence that the Order was so construed. Pls.' Mem., ECF 92-1, at 13-14.

24    Plaintiffs also assert that the Stay-at-Home Order is underinclusive because it permitted

25    essential workers to leave their homes to staff convenience stores and deliver pizza, facilitating

26    interactions that carried a risk of spreading COVID and thus were contrary to the State's objective

27    to prevent the spread of COVID. Pls.' Mem., ECF 92-1, at 15. Not so. A demonstration is not

28    analogous to errands to buy food or medicine, which are brief transactions with limited

22

1   opportunities for prolonged interaction among strangers.  Instead, its risk profile is more similar

2   to attending a concert or sporting event, where crowds of strangers assemble in relatively closer

3   proximity for a longer period of time to share a communal experience.  Those activities were also

4   prohibited under the Stay-at-Home Order when the temporary pause on permitting was in effect.

5       In sum, the Stay-at-Home Order was narrowly tailored to serve the State's compelling

6   interest in slowing the spread of COVID-19.  Thus, even if strict scrutiny were to apply, Plaintiffs

7   would still fail to establish that a material fact exists that would preclude Defendants' motion for

8   summary judgment.

9       **D.    The Stay-at-Home Order Overcomes Any Presumption of Invalidity**

10      In an alternative argument, Plaintiffs contend that the Stay-at-Home Order should be

11  presumed unconstitutional, stopping short of applying either intermediate or strict scrutiny, based

12  on the following asserted qualities:  (1) it is a prior restraint, (2) it regulates political speech, and

13  (3) it regulates speech in a traditional public forum.  Pls.' Mem, ECF 92-1, at 7-9.  On its face, the

14  Stay-at-Home Order did none of these things; it was aimed at conduct, not speech.  To the extent

15  it informed CHP's determinations to temporarily suspend issuing permits, as demonstrated above,

16  the Stay-at-Home Order overcomes any presumption of invalidity as a valid time, place and

17  manner restriction, and Plaintiffs' alternative arguments provide no reason to depart from this

18  framework.  *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1021 (9th

19  Cir. 2009) ("By meeting certain criteria, content-neutral time, place and manner restrictions may

20  overcome the presumption of invalidity").

21      1. Plaintiffs cannot establish that the Stay-at-Home Order operated as a prior restraint.  The

22  Stay-at-Home Order, by its plain terms, did not authorize CHP—or any other state actor for that

23  matter—"to pass judgment on the content of speech:  None of the grounds for denying a permit

24  has anything to do with what a speaker might say." *Thomas v. Chicago Park Dist.*, 534 U.S. at

25  322 (holding that a content-neutral time, place and matter restriction on the use of a public forum

26  need not adhere to prior restraint procedural requirements).  To the extent the Stay-at-Home Order

27  authorized CHP to deny permits, CHP did not deny them based on the content of speech; during

28  the period in question, all permits applications from all applicants were denied.  Accordingly, the

23

1   Stay-at-Home Order is correctly analyzed as a time, place, and manner restriction. Indeed, "if
2   content-neutral prohibitions on speech at certain places were deemed prior restraints, the
3   intermediate standard of review prescribed in the time-place-manner jurisprudence would be
4   eviscerated." *Bl(a)ck Tea Society v. City Of Boston*, 378 F.3d 8, 12 (1st Cir. 2004).

5       2. Political speech falls among categories of speech that may be entitled to First
6   Amendment protection. *Long Beach Area Peace Network*, 574 F.3d at 1021. But contrary to
7   Plaintiff's argument, Pls.' Mem, ECF 92-1, at 8, nothing on the face of the Stay-at-Home Order
8   purports to restrict political speech. Instead, for 14 of the 15 months that the Stay-at-Home order
9   remained in place, political demonstrations could take place at the Capitol and elsewhere. *See* pp.
10  4-6, *supra*.

11      CHP's construction of the Stay-at-Home-Order as barring protests impacted—only
12  temporarily—the time, place and manner of Plaintiff's political speech. But Defendants did so
13  without regard to the content of speech and in a manner that was narrowly tailored to effectuate
14  the State's compelling reason to control the spread of COVID and the burden on healthcare
15  systems in the earliest days of the pandemic. This is sufficient to overcome any presumption of
16  invalidity. *See Ward*, 491 U.S. at 800, n. 6 ("the same degree of tailoring is not required" for
17  time, place and manner restrictions, even those affecting political speech.).

18      3. Finally, the Stay-at-Home Order is also not presumptively invalid on account of the
19  suspension of permits in a public forum—and Defendants agree the grounds around the State
20  Capitol is one. But even still, this presumption is overcome by the Stay-at-Home Order's status
21  as a valid time, place, and manner restriction. Further, Plaintiffs ground their argument in a
22  collection of cases recognizing that the grounds surrounding legislative buildings are traditionally
23  significant grounds for political expression and assembly precisely because they are "a place for
24  the citizenry to convey important messages to its lawmakers." *Berger v. City of Seattle*, 569 F.3d
25  1029, 1036 (9th Cir. 2009); Pls.' Mem, ECF 92-1, at 8; *see also id.* at 17 ("On the Capitol grounds,
26  citizens are likely to draw the attention of state legislators and executive branch officials as they
27  enter and leave the Capitol building."). The significance of this forum is diminished as it relates
28  to Plaintiff's permit applications, since Plaintiffs scheduled both events during a [seven-week]

24

1   legislative recess occasioned by the pandemic. Finally, Plaintiffs argue that the Stay-at-Home

2   Order is presumptively invalid because it concerns activities taking place in a public forum.

3   Defendants agree the grounds around the State Capitol are a public forum. As this Court has

4   already recognized, however, the State may regulate speech in a public forum when, as here, the

5   restriction "'is not subject-matter censorship, but [a] content-neutral time, place, and manner

6   regulation of the use of a public forum.'" Order Denying TRO, ECF 18, at 11, *quoting Thomas v.*

7   *Chicago Park Dist.*, 534 U.S. at 322.

8       Accordingly, the Stay-at-Home Order is not a prior restraint and overcomes any

9   presumption of invalidity based on its impact on political speech in a public forum.

10  **II.   THE STAY-AT-HOME ORDER DID NOT VIOLATE PLAINTIFFS' RIGHT TO PETITION**

11      The First Amendment protects "the right of the people . . . to petition the Government for

12  redress of grievances." U.S. Const. amend. I; *see also Borough of Duryea, Pa. v. Guarnieri*, 564

13  U.S. 379, 382 (2011). The rights of speech and petition share substantial common ground. *Id.* at

14  388. They are thought of as "cognate rights." *Thomas v. Collins*, 323 U.S. 516, 530 (1945).

15  Nonetheless, there are subtle differences between the two. "The right to petition allows citizens

16  to express their ideas, hopes, and concerns to their government and their elected representatives,

17  whereas the right to speak fosters the public exchange of ideas that is integral to deliberative

18  democracy as well as to the whole realm of ideas and human affairs." *Borough of Duryea*, 564

19  U.S. at 388. While both advance personal expression, "the right to petition is generally concerned

20  with expression directed to the government seeking redress of a grievance." *Id.*

21      Here, Plaintiffs' petition claim is co-extensive with their freedom of speech and assembly

22  claims. Gathering outside the State Capitol for a rally or demonstration with the purpose of

23  raising a particular political issue and seeking a particular outcome from the government could be

24  considered a form of petitioning the government. However, in this case, Plaintiffs have not raised

25  any distinct concerns in connection with their petition claim aside from those that are addressed

26  by their freedom of speech and assembly claims. While "[t]here may arise cases where the

27  special concerns of the Petition Clause would provide a sound basis for a distinct analysis"

28  between the right to petition and freedom of speech, this is not such a case. *Borough of Duryea,*

25

Defs.' Notice of Cross-Mot. and Cross-Mot. for Summ. J.; Mem. P & A (2:20-cv-00852)

564 U.S. at 389. Furthermore, various alternative means existed by which Plaintiffs could have made their views known to the government. Nothing in the orders prevented plaintiffs from presenting written letters and petitions, sending emails or making telephone calls to the Governor's Office, to the other Defendants in this case, or to their State Assembly members and Senators. They could also have used the methods mentioned in connection with Plaintiffs' free speech claims—social media, radio, television, newspapers, and even demonstrations that involved driving around the Capitol. Plaintiffs' petition claim thus fails for the same reasons their speech and assembly claims fail.

As this Court previously found, Plaintiffs' goal was to regain the ability to speak and assemble on the grounds of the State Capitol. Compl., ECF 1, at ¶¶ 2-4; Order Denying TRO, ECF 18, at 19. As a result, their Petition Clause claim is inextricably intertwined with their Speech Clause and Assembly Clause claims, *id*., and fails for the reasons as those claims, *see* Section I.A, *supra*.

### III.   PLAINTIFFS' DUE PROCESS CLAIM FAILS BECAUSE THE EXECUTIVE ORDER WAS NOT UNCONSTITUTIONALLY VAGUE.

Plaintiffs do not move for summary judgment on the complaint's fourth claim for relief alleging that the Executive Order is void for vagueness in violation of the Due Process Clause. As such, they have abandoned the claim, which should be dismissed. The claim also fails on its merits.

Plaintiffs' vagueness claim turns on the use of the word "heed" in the Governor's Executive Order. The use of "heed," however, is not only sufficiently definite in context, it lacks any nexus to the purported injuries claimed by Plaintiffs.

The Stayat-Home Order is sufficiently definite to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and will not compel speakers "to steer too far clear of any forbidden area" of speech. *Edge v. City of Everett*, 929 F.3d 657, 665 (9th Cir. 2019). "[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Id*. The Stay-at-Home Order does just that; it ordered Californians to stay at home except for essential activities or to work in essential jobs. Public gatherings were

26

1    thus prohibited, and CHP's interpretation that permits for gatherings could be temporarily

2    suspended was appropriate.

3         Whether or not the phrase "heed the current State public health directives" could be

4    understood as a recommendation if read in isolation, the remainder of the Order, and the

5    incorporated health directives, are unambiguous. The Order's instruction to heed to public health

6    directives is immediately preceded by the phrase "IT IS HEREBY ORDERED . . . ." Walter

7    Decl., Ex. A [Rutherford Report] at Ex. 31. As such, it is mandatory.

8         Next, the Stay-at-Home Order  incorporated the "Order of the State Public Health Officer."

9    *Id.* Within that order, the State Public Health Officer and Director of the California Department

10   of Public Health "order[s] all individuals living in the State of California to stay home or at their

11   place of residence except as needed to maintain continuity of operations of the federal critical

12   infrastructures." *Id.* As the Court recognized in its order denying the TRO application, it would

13   not have been reasonable for Plaintiffs to interpret it as permitting groups of 500 to 1,000 to meet,

14   in person, for any purpose other than those defined as "needed to maintain continuity of

15   operations of federal critical infrastructure." TRO Order at 21.

16        Additionally, regardless of the Executive Order's direction that Californians "heed" the

17   Stay at Home Order, orders of the State Public Health Officer have force and effect of law under

18   independent provisions of the California Health and Safety Code cited in the Stay-at-Home

19   Order. *See* Cal. Health & Safety Code § 120140 (authoring the CDPH to "take measures as are

20   necessary to ascertain the nature of [a communicable] disease and prevent its spread"). Because

21   independent statutory authority supported the health order at issue, any purported confusion over

22   the meaning of "heed" in the Executive Order is irrelevant to the alleged injury here: the

23   mandatory authority behind the health order was clear under state law.

24        Moreover, the word "heed" in the Stay-at-Home Order, rescinded nearly a year ago, caused

25   Plaintiffs no harm whatsoever even if the term could be considered vague. Plaintiffs cannot

26   maintain a claim without linking an action of the Defendants to a harm. Under 42 U.S.C. § 1983,

27   there must be an actual connection or link between the action of a defendant and the deprivation

28   alleged to have been suffered by the plaintiff. *See Monell v. Dep't Soc. Servs.*, 436 U.S. 658, 691

                                                27

1   (1978).  There is no such connection here between the term "heed" and the deprivation of any of

2   Plaintiffs' rights.  Whether CHP interpreted the word "heed" as defined by Webster's Dictionary

3   to mean "give consideration or attention to" or "to adhere to those directives," Compl., ECF 1,

4   ¶ 77, is immaterial as CHP chose to give consideration and attention to the public health

5   directives and to adhere to them when changing its permitting policies.  It is the denial of

6   Plaintiffs' permits to protest at the Capitol that forms the basis of Plaintiffs' complaint and their

7   injuries.  It is immaterial whether they believe the meaning of "heed" was ambiguous.

8   **IV.   PLAINTIFFS' CLAIMS SHOULD BE DISMISSED AS MOOT**

9        This Court has twice ruled that Plaintiffs' claims are not moot, most recently in an October

10   2021 order denying Defendants' motion to dismiss based on the rescission of both the Stay-at-

11   Home Order and guidance establishing attendance caps on gatherings and other activities.  MTD

12   Order dated Oct. 5, 2021, ECF 86, at 7.  That Order noted that intervening Ninth Circuit authority

13   might warrant reconsideration.  *Id.*  Although the Ninth Circuit has not yet issued a merits

14   decision on mootness in a case regarding COVID restrictions since then, the Ninth Circuit did

15   grant rehearing en banc in *Brach v. Newsom* and vacated a panel opinion that had rejected a

16   mootness argument.  18 F.4th 1031, *vacating* 6 F.4th 904  (2021).  Moreover, decisions from

17   several other Courts of Appeals and new factual developments and legal authorities during the

18   nearly eight months since the Court last considered this issue provide additional support that the

19   exception for voluntary cessation no longer applies here.

20        A case "becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of

21   Article III—'when the issues presented are no longer "live" or the parties lack a legally

22   cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citing

23   *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)).  As this Court previously found, courts have

24   recognized that a defendant's "voluntary cessation of challenged conduct does not ordinarily

25   render a case moot because a dismissal for mootness would permit a resumption of the challenged

26   conduct as soon as the case is dismissed." MTD Order dated Oct. 5, 2021, ECF 86, at 4 (citing

27   *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014)).  But this concern can only be present

28   where the new mandate is so similar to the old mandate as to present substantially the same legal

28

Defs.' Notice of Cross-Mot. and Cross-Mot. for Summ. J.; Mem. P & A (2:20-cv-00852)

1   controversy as the original challenge. *See Ne. Fla. Chapter of Associated Gen. Contractors v.*

2   *City of Jacksonville*, 508 U.S. 656, 662, n.3 (1993). Further, the voluntary cessation exception

3   does not apply where there is no reasonable expectation that the challenged conduct will recur.

4   *Id.* at 662.

5        This Court concluded in October 2021 that ongoing uncertainty surrounding the course of

6   the COVID-19 pandemic precluding a finding of mootness under the voluntary cessation

7   exception. Now, more than two years after the original Stay-at-Home Order there is no longer

8   any reasonable expectation that the State may revert to the prior restrictions prohibiting outdoor

9   gatherings at the Capitol.

10       The Sixth Circuit, sitting en banc, recently dismissed a constitutional challenge to

11  Michigan's former mask mandate in schools on mootness grounds in *Resurrection School v.*

12  *Hertel*, No. 20-2256, __ F.4th __, 2022 WL 1656719 (6th Cir. May 25, 2022). That case

13  illustrates how recent changes in the course of the pandemic have eliminated any likelihood of

14  recurrence. In it, the Sixth Circuit directed the district court to dismiss plaintiff's free exercise

15  claims—filed in October 2020—as moot following the June 2021 rescission of the mask mandate.

16  The en banc court determined that there was no likelihood that a similar mask mandate would be

17  re-imposed based on several factors. First, the court found that the order was rescinded not

18  because of litigation "gamesmanship," but rather on account of changed circumstances, including

19  high vaccination uptake, low case counts, and new treatment options, all of which lessened the

20  impetus for the mandate, which was imposed when "nobody was vaccinated and treatments were

21  less effective." *Id.* at *2. In addition, once rescinded nearly a year had gone by without the

22  mandate being reimposed, even during the Delta and Omicron surges. *Id.* at * 4 (Moore, J.,

23  concurring).[11]

24       The same circumstances defeat plaintiffs' arguments for an exception to mootness here.

25  Plaintiffs' permits were denied to stop the spread of COVID-19 and prevent the State's health

26  _____
    [11] Other circuits have found challenges to restrictions imposed because of the COVID-19
27  pandemic moot, including *Lighthouse Fellowship Church v. Northam*, ___ F.4th ___, 2021 WL
    5894891 (4th Cir. Dec. 14, 2021), *Boston Bit Labs, Inc. v. Baker*, 11 F.4th 3 (1st Cir. 2021), and
    *County of Butler v. Governor of Pennsylvania*, 8 F.4th 226 (3d Cir. 2021).
28

1    care system from being overwhelmed in the early stages of the pandemic response. *S. Bay United*

2    *Pentecostal Church v. Newsom*, 985 F.3d 1128, 1132-36, 1141 n. 21 (9th Cir. 2020).  With the

3    risk to the State's healthcare system substantially reduced by widespread vaccination—which has

4    increased further since the Court's October 5, 2021 order[12]—and the availability of retroviral

5    drugs, Walter Decl., Ex. A [Rutherford Report], at ¶ 59, this purpose has now been served.

6         With respect to the temporary halt to permits at the Capitol at issue here, it has been nearly

7    two years since such policies have been imposed.  The State eliminated all capacity restrictions

8    on businesses and activities one year ago, Defs.' RJN, Ex. 10, and has not reintroduced them in

9    the time since, which includes the Omicron surge of last December through February.  In contrast

10   to October 2021, when the retirement of the Blueprint was relatively recent, the durability of

11   change in policy indicates that, at this point, it has now become "entrenched." *Am. Diabetes*

12   *Ass'n v. U.S. Dept. of Army*, 938 F.3d 1147, 1152 (9th Cir. 2019) (government can show conduct

13   not reasonably expected to start again by showing the change is "entrenched" or "permanent").

14        Consistent with these changed circumstances, the State's pandemic response framework has

15   moved away from closures and capacity restrictions as tool to combat the spread of disease.  At

16   this time, the operative framework for managing the ongoing COVID-19 pandemic is the

17   SMARTER plan, an acronym that stands for Shots, Masks, Awareness, Readiness, Testing,

18   Education, and Rx, which focuses on increasing vaccination rates, monitoring COVID-19 case

19   levels through testing and wastewater monitoring, and ensuring a stockpile of masks and

20   treatment medications. *See* Defs.' RJN, Ex. 11.  Nowhere does the 30-page SMARTER plan,

21   released after the Court issued its October 2021 order, contemplate reimposing the broad-based

22   bans on gatherings that plaintiffs challenge here, or the related capacity restrictions on businesses

23   that were part of the Blueprint) as a means to address COVID-19, providing new evidence

24   supporting the conclusion that there is no reasonable expectation that such non-pharmaceutical

25   interventions will be reimposed.

26

27        [12] By now, over 75% of the state population over age 5 is fully vaccinated, around another
     8% are partially vaccinated, and 59% have obtained a booster shot.  See "Statewide Vaccination
28   Data," https://covid19.ca.gov/vaccination-progress-data/m (last accessed May 26, 2022).

30

1  Given the rescission of the prior orders, the markedly different landscape of the pandemic

2 today, and the durability of the current policy, and several recent district court decisions within

3 the Ninth Circuit, Defendants respectfully suggest that it would be appropriate for the Court to

4 reconsider its prior ruling on mootness. *Accord Calvary Chapel San Jose v. Cody*, 2022 WL

5 827116, at \*7 (N.D. Cal. Mar. 18, 2022) (finding no likelihood of recurrence); *Pine Valley House*

6 *Resort, LLC v. Newsom*, 2022 WL 747729, at \*8 (S.D. Cal. Mar. 10, 2022) (same).

7            **CONCLUSION**

8  For the foregoing reasons, the Court should grant Defendants' cross-motion for summary

9 judgment, deny Plaintiffs' motion, and enter judgment in Defendants' favor.

10

11 Dated:  May 31, 2022       Respectfully submitted,

12             ROB BONTA
              Attorney General of California

13             PAMELA J. HOLMES
              MARK R. BECKINGTON

14             Supervising Deputy Attorneys General
              ANNA FERRARI

15             Deputy Attorney General

16

17             */s/ James W. Walter*

18

19

20             JAMES W. WALTER
              Deputy Attorney General

21             *Attorneys for Defendants*

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

Case Name:   **Ron Givens, et al v. Gavin**          Case No.   **2:20-cv-00852-JAM-CKD**
**Newsom, et al.**

I hereby certify that on **May 31, 2022,** I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANTS' NOTICE OF MOTION AND CROSS MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT; STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT; DECLARATION OF JAMES WALTER IN SUPPORT; DEFENDANTS' RESPONSES TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS; EXCERPTS OF DEPOSITIONS IN SUPPORT, AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct and that this declaration was executed on **May 31, 2022,** at Sacramento, California.

| Lois M. Buzbee-Osby | */s/ Lois M. Buzbee-Osby* |
|---|---|
| Declarant | Signature |

36215426.docx